MARVEL LUCILLE MYERS, RESPONDENT, v. KANSAS CITY JUNIOR ORPHEUM COMPANY, APPELLANT.—73 S. W. (2d) 313.

Kansas City Court of Appeals. July 2, 1934.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

*Calvin, Vandeventer & Kimbrell* for respondent.

*Harding, Murphy & Tucker* for appellant.

TRIMBLE, J.—Prior to and since January 13, 1929, defendant has operated in Kansas City, Missouri, what is known as the "Main Street Theater." On that date, about 7:30 P. M., plaintiff entered said theater as a patron in company with her husband and mother-in-law, and after tickets to the evening show had been purchased, she with her said companions stood in the lobby waiting until the first show was over and the audience had come out, so that they might obtain seats on the main floor for the second presentation of said show. While so standing in the lobby she was next to a plush rope stretched across the lobby to keep the crowd from entering the theater auditorium until the management of the theater was ready for the assembled and waiting patrons to do so.

Plaintiff claims that the pressure of the assembling crowd finally became so great that she was unable to escape from her position and was pushed or forced against said rope across her abdomen and finally was bent over it and either fell or was thrown to the floor. She was several months advanced in pregnancy and pleads that she was thereby caused to undergo a miscarriage.

She brought this suit for damages alleging, as the grounds of her cause of action, that on the date and hour, and with the companions aforesaid, she entered the lobby and purchased tickets as stated, whereupon defendant through their ushers undertook to seat her, but—

"That on January 13, 1929, she, having paid the defendants their regular charge for admission, was permitted by the defendants to, and she did, enter the same, whereupon the defendants, through their ushers, agents, servants and employees, undertook to seat her therein, so that she might, comfortably, witness the performances which they

were then and there presenting to their patrons and the public, generally.

"That, owing to the fact that the defendants had, prior to her admission into said theatre, allowed and permitted a great number of their patrons to enter and be seated therein, there were not, at the time she was permitted to enter the same, as aforesaid, any seats available for her or many others of their patrons, whom defendants had theretofore and then permitted to enter the lobby of said theatre, for the purpose of later witnessing the performance which the defendants were then and there conducting therein, as aforesaid; and, by reason thereof, she, together with other of defendants' patrons, was compelled to, and she did, for a time, remain standing in the lobby of said theatre, and in close proximity to and against a rope, or chain, which the defendants had theretofore stretched across the entrances into the aisles of said theatre, and which they were then and there maintaining in said position, for the purpose of preventing their patrons from entering that part of their theatre which was provided with seats for their patrons until such time as they might order and direct, through their ushers, agents, servants and employees, to remove such rope, or chain, and to permit such number of their patrons as might then be accommodated with seats therein to enter said aisles, and that part of their said theatre which was provided with seats, as aforesaid.

"That, while and as she was standing in the lobby of said theatre, as aforesaid, and in close proximity to and against said rope, or chain, as aforesaid, the defendants, their agents, servants and employees, notwithstanding said lobby was already filled to its capacity, and congested, with their patrons, carelessly and negligently caused, allowed and permitted a large and additional number of their patrons to enter the lobby of said theatre, crowding the same both to its capacity and to the point of overflowing, by reason of which certain of their patrons, who were standing in close proximity to her, were so pushed and swayed by the crowd, which was then occupying the lobby of said theatre, that they were, with great force and violence, caused to, and they did, bear down upon her, forcing her against said rope, or chain, which was in turn drawn tightly across her abdomen, and over which she was finally, and by reason of the great pressure from the said crowd, forced to bend, finally being crushed to the floor of said lobby.

"That, as a direct result and consequence thereof, her abdomen was so bruised and strained, and the pressure thereon so great, that she was then and there caused to, and she did, suffer both great bodily pain and mental anguish, and became, and was, so terrified at the thought that she was about to receive severe personal injury, by reason of the overcrowded condition of said lobby, that she suffered a severe and general nervous shock; and, as a direct result and consequence

of the physical injury and nervous shock which she sustained, as aforesaid, she, being at said time enceinte, was caused to, and she did, undergo a miscarriage; and, as a direct result and consequence thereof, she was caused to, and she did, suffer both great bodily pain and mental anguish, was for a long time confined to her room and to her bed, was for a time prevented from performing any of the duties incident to her employment; and, on account of her aforesaid injuries, and as a direct result and consequence thereof, her general health, her bodily strength and its youthfulness have become, and they are, seriously and permanently weakened and impaired.''

Wherefore judgment was prayed for $3000. ..

Defendant's amended answer (date of filing not stated in the abstract), contained *first* a general deniel, *next* a plea of negligence on her part in that she failed to exercise ordinary care for her own safety, and then, for further answer, alleged that—

''At said time and place referred to in plaintiff's petition, it was usual and customary for patrons of said theatre to assemble in the lobby of said theatre referred to in plaintiff's petition; that when said plaintiff entered said lobby and became a part of the crowd there assembled awaiting entrance into said theatre proper, she did so at her own risk, and assumed all the risk incidental to her act of placing herself in and becoming a part of the crowd there assembled, and this defendant states that it is in no way liable or responsible for such injuries, if any, that may have been suffered by said plaintiff by reason of the foregoing.''

A trial was thereupon had resulting in a verdict for plaintiff in the sum of $2500 upon which a judgment was rendered, and defendant appealed.

At the close of the opening statement by counsel for plaintiff, defendant's counsel orally moved for judgment for defendant on said opening statement, which was overruled, the defendant excepting.

Lawrence Myers, husband of plaintiff, testified that he and plaintiff were married June 9, 1928, and they in company went with his mother to the defendant's theater about 7:30 P. M., of January 13, 1929; that a show was in progress when they reached the theater, and he asked the ''doorman'' how long before they could be seated, and he replied ''about ten minutes.'' Witness thereupon bought three tickets and he, with his wife and mother, passed into the lobby. As they went into the lobby there was ''quite a number'' of patrons already in there. Witness identified a diagram of the entrance to the theater showing the outside door to be at the northeast corner of the building and immediately inside was Lobby No. 1 with the ticket seller's cage against the west wall thereof, and after obtaining tickets there, the purchasers passed the cage into a room west of it, where the ticket *taker* stood at his place at a point a few feet west of where they passed the ticket seller's cage, and after delivering

their tickets to him, they were ushered into Lobby No. 2. It was cold and only one door opened into Lobby No. 2. Along the south side of Lobby No. 2 were doors opening into the ground floor auditorium of the theater. These however were locked and kept so until the management was ready to open them and permit waiting patrons to enter the show. At the west end, but outside of Lobby No. 2, was a stairway leading up to the balcony overlooking the auditorium and stage in which, of course, were seats for those in the balcony who could see the show. Whether or not there were vacant seats there at this time, does not appear. Along the north line of Lobby No. 2 were exits leading out to the street, and about a third of the width of Lobby No. 2 south of the north line of said lobby defendant had a rope stretched from the east to the west end and attached to the wall by hooks. Witness said this rope was "a big massive affair —it has to be to hold that group of people." This rope is where people were stopped until the management wanted to let them into the auditorium or theater proper.

Witness Myers further testified that after the accident to his wife, he helped the usher to unhook this rope; and the pressure of the people against the rope was so great that it took the combined weight of both of them, about 280 pounds, to pull on the rope in order to get it unhooked. His wife's position at this time was that she was "bent double over the rope, over her adomen, and right over it." Witness thought one other woman was over it, but on motion the court struck this out. After the rope was unhooked "it let my wife and this other woman down to the floor and the rest of the people surged over them and into the theater."

Witness further testified:

"The pressure was caused by the people, they kept crowding forward, kept crowding forward, and they were not letting people into the theater proper as fast as they were letting them in and selling tickets, and into the lobby. We got congested in there, and got so dense with people that you could not move back and forth. In a crowd like that, you have to go as the crowd goes, and finally it reached the point where the strain was too much; it pushed us against this rope. We had been in there over an hour, and we were working ourselves over here slowly, as they let people in; we had to go with the crowd that next came in, and that is where the accident occurred.

"Q. You say here—you mean you had worked from the east end of lobby? A. Yes, sir.

"Q. Of No. 2 back to the west end of lobby No. 2? A. Yes, right.

"Q. Had you at that time, and prior to the occurrence you were about to relate, gotten back against the rope? A. No, sir, not prior to that time, it was impossible to get to the rope, the people were packed and jostling around in front of that.

"Q. Were you against the rope ultimately? A. Finally reached the rope."

Witness testified he ultimately got his wife up on her feet and he and his mother took his wife to a bench alongside the steps at the balcony where the three sat down and remained there for perhaps ten minutes, he thought. The manager of the theater came and inquired what had happened; he and the ushers were all talking at once and the people were excited. Witness' mother finally took his wife to the restroom downstairs; when they came back, they (the management) made arrangements for seats, and the three were taken through the crowd and seated in the theater. The usher did this. They remained throughout the performance on the back row in the theater, during which time the wife was complaining. No physician was called at the theater. The show ended about 11:30 that night. A physician was called next day. The wife was ill before they got home and when "we got home she was in dreadful pain." She was treated by the physician for about six weeks and confined to her bed for "fully three weeks" and to her home for somewhere near six weeks.

After the accident, witness says, his wife "became nervous, excitable and easily alarmed, and she had cramps and pains in her abdomen and different kinds of pains. I am not a doctor, and I can't describe them perfectly. I know that she immediately became changed and suffered a great deal and still does. She was unable to do anything about her household duties for six weeks."

The witness then was asked about the crowd in the lobby at the time of his wife's injury and as to whether there were more people entering the lobby from time to time. He said—

"They were entering all the time; they were selling tickets and letting people in the lobby—never stopped once.

"Q. Was any of that crowd being absorbed by going into the—A. (interrupting) They were letting a few into the show, yes, sir.

"Q. And, describe the conditions in the lobby, particularly where you were, as to crowd—whether or not you could observe the crowd entirely, all throughout? A. No, I could not see the entire crowd, because we were crowded so closely, and the congestion so great that I could not see within four or five feet of me—I am rather short, and I could not see over the heads of the rest of the people, but there were a great many people in there.

"Q. What was the effect of that crowd on you, the pressure on you? A. The pressure was just like—oh, more like the waters of the ocean; as they let more people in, it kept pushing tighter and tighter, and the crowd started getting more dense and more congested, and finally reached the point of shoulder to shoulder and back to back, and we could not turn or move except as the crowd moved.

"Q. Were you able to resist the force of the coming crowd? A. No, sir.

"Q. You say you could not move only as the crowd moved? A. Yes, sir.

"Q. Tell the jury whether or not there was any swaying movement about the time of this occurrence? A. Yes, somewhere back of us, a little commotion of some sort that started the crowd swaying, and started the pressure to increasing.

"Q. I will ask you whether if that was true this time your wife got over the rope? A. Yes, sir.

"Q. State whether or not you were seeking to prevent her from being placed in that position? A. Naturally I done everything I could, but the crowd was closer to my arms and pinned my arms in such a way I could not prevent it happening.

\* \* \* \* \* \*

"Q. I will ask you how long your wife was in that position that she was there, over that rope? A. About thirty seconds.

"Q. Now, tell the jury what you did toward protecting your wife prior to her getting on the rope? A. Before they pushed her over the rope, I pushed back the best I could, because we could not go forward, I held back the best I could, but I could not hold the entire crowd back, and naturally they overpowered me finally, and she was pushed over the rope, and at that time was when she started screaming and hollering, and I could see she was hurt. I stepped over the rope and went to the assistance of the usher; he could not undo it himself.

"Q. Was he trying to do so? A. Yes, sir.

"Q. And the two of you did undo it? A. Yes, the two of us undid it.

"Q. Was your wife on the floor immediately following? A. When we did unhook the rope that let her fall down to the floor.

"Q. Did you assist her? A. I helped pick her up, yes, sir.

"Q. What was going on by way of raffling off this candy, while you were in that lobby?

"MR. TUCKER: Objected to as immaterial, and it does not tend to prove or disprove any issue in the case, and, as shown by their own exhibits, the candy booth was far removed from the place of the accident.

"THE COURT: Objection overruled.

"(To which action and ruling of the court, the defendant then and there duly excepted at the time and still excepts.)

"Q. Answer the question, what they were doing? A. They were selling chances on small boxes of candy, and doing all kinds of talking or barking, like they do at circuses or a sideshow.

"Q. Was there commotion around there? A. Naturally where

there is any sort of a proposition that has a little gambling element to it, there is bound to be a little commotion and excitement.

"Q. Was there? A. Yes, there was.

"Q. State whether or not that had any effect on augmenting the crowd in that region? A. I don't believe it did. It might have excited them. After we got past them, I don't know, but, while we were there it did tend to make the people crowd into each other and reach over backs and shoulders, and getting to the candy booth and buying chances.

"Q. Tell the jury whether or not there was any place in that portion of the lobby, anywhere you were around the booth, where you might have stood more comfortably, than where you were? A. No, sir, no space we could get to, no, sir."

On cross-examination he was asked what he saw as he entered lobby No. 2, after he had handed the tickets to the ticket taker, and he replied, "I saw a crowd of people up at the west end of the lobby— up toward the west end." They were, at this time, reaching about halfway back in the lobby; he did not have any idea how many there were, he didn't know how many. "Might have been 500 and probably a thousand." He did not know this at the time he entered the lobby, he was not looking at the crowd, but after he got up there he noticed the crowd; this was only a matter of a few seconds, just the time it would take to walk from one end of the lobby to the other, so that approximately when he noticed the crowd it was the crowd that was there when he entered. He and his wife had attended this theater before but he had never seen lobby No. 2 holding a waiting crowd before, they had used lobby No. 3.

On the occasion or night of the injury they waited in lobby No. 2 approximately one hour and thirty minutes. Both husband and wife knew she was "in a delicate family condition" and they stood on their feet from 7:30 to almost nine P. M. Some one on the stairs, witness did not know who it was, said there were seats in the balcony; the three attempted to get into the balcony but learned there were only "single seats" therein and they did not wish to be separated that way. No one connected with the management of the theater was told by witness or the wife or mother of the delicate condition she was in, nor was anyone asked to make special concessions or to let her in where she could sit down.

The physician who was called next day and who examined her, testified that he found black and blue places on her abdomen, on both thighs, on her right arm and abdomen, low down in the groin; an abrasion, but the skin was not torn; there was a little hemorrhage under the skin causing the black and blue condition; she was nervous and suffering pain; she was confined to her bed during the time he treated her. He examined her and found evidence of a threatened miscarriage—"not a suspected abortion, but it was absolutely going

to be." The foetus was expelled and that is a miscarriage. She has been nervous more or less ever since. He kept her "under sedatives quite a while." In some ways she is better and in others she is worse; one of the effects of a miscarriage may be sterility. He testified that being suspended over a rope across the abdomen, or crowded on it sufficient to cause a hemorrhage under the skin, would be sufficient to produce a miscarriage. He had only one assumption and that is the thing that produced it, he could not conceive of anything else.

A Mr. Reddinger, father of plaintiff, testified he was not present at the time of plaintiff's injury, but, in company with Mrs. Myers, plaintiff's mother-in-law, he went to the theater the next day and saw the manager thereof and had a conversation with him and after telling him of plaintiff's injury, asked him if he had a doctor that he wanted to send out or should they get their own doctor and he said for them to get their own doctor. He acknowledged the accident or incident that occurred, and said they "had a very heavy attendance the night before, and it was hard to control the crowd."

Mrs. Myers, mother of plaintiff's husband, testified that she went with her son and daughter-in-law to the theater that night and was standing beside plaintiff near the rope in question, "right in front of us." She was asked, "Could you describe the crowd around you while you were in the lobby?" to which she replied:

"A. Well, they were packed in there so tight, so close, we could not move.

"MR. TUCKER: I move to strike that out as a conclusion of the witness.

"THE COURT: All right.

"Q. Could you feel the crowd around you, or on all sides? A. Yes, sir.

"Q. Could you feel the pressure and presence of the crowd against you? A. They were pressing toward the front, because they were all anxious to get in the show.

"Q. Describe to the jury whether or not there was any means of exit out of that crowd. A. Absolutely none.

"MR. TUCKER: I move to strike that out as a conclusion of the witness—she can tell what she knows.

"THE COURT: Objection sustained.

"Q. What did you observe with reference to Mrs. Myers, your daughter-in-law, while you were standing near that rope there referred to in the testimony. A. Well we were all tired and weary, and we were anxious to get in the show there, but that was nothing unusual.

"Q. I am asking you what occurred while you were there—did you notice anything occur there with reference to Mrs. Myers? A. Oh, only the crowd pushed—

"Q. (Interrupting) Indicate what you saw. A. The crowd

started surging and whoever was standing behind her, I don't recall, but they pushed her over the rope, and she hung there over the rope, and was screaming; and there was nothing I could do to release her; and some way my son got over the rope, they got the rope down, and she fell.

"Q. Did you observe anyone unfasten that rope from the fastening? A. Not until my son got to the end of the rope.

"Q. I say, did you see it done, see the men unfasten it? A. I know it was unfastened, and I was trying to help her.

"Q. Did you observe any other person draped over that rope, to any degree? A. No.

"MR. TUCKER: I object to that.

"(No ruling.)

"Q. Now, how was Mrs. Myers disposed of immediately after she was picked up—you said she was picked up, I believe? A. My son kind of pushed the crowd back so we could get through, and Mr. Lehman was there.

"Q. This gentleman here? A. Yes—he was there, and he came and he assisted me and we led her over to a seat right beside the stairway going upstairs, and she sat down there."

She then testified, corroborating what has been heretofore stated as what occurred at the theater after plaintiff was hurt; also that when they got home that night plaintiff—

"Was nervous and suffering a little, you know, the bruises were very evident across her abdomen, but I fixed a hot water bottle and things. I thought I would ease her."

Witness further testified that next morning plaintiff was "much worse hurt than I thought she was the night before." A doctor was called; and her testimony was, in effect, the same as has been heretofore stated.

The plaintiff testified that she was twenty-six years old, and that she had been married eight months at the time of her injury, that at the time of her injury she was in good health though pregnant. She testified to the enclosure made by the rope in lobby No. 2 and of her being therein with her husband and mother-in-law near her, she herself being next to the rope. When asked about the crowd, she said: "There was a very great crowd around me; it was impossible to move." She testified she was five feet tall, "a little short, possibly about that." She further testified that as she was standing there by the rope, and—

"All of a sudden the crowd began pushing, and I tried to push back, I could not push back, and I worked my hands down, and the crowd just came on, and I finally worked my arms out, and that crowd was so great behind me I was pinned over the rope, and there was nothing for me to do but call out, and scream, and—

"Q. (Interrupting) Did you feel the pressure of the rope upon your abdomen? A. Yes.

"Q. Was it taut or otherwise? A. It was very taut, and no slack in the rope whatsoever. I can remember very distinctly.

"Q. Mrs. Myers, did you bend over the rope, or were you bent over the rope? A. Yes, I was bent over the rope.

"Q. State, in a general way, tell the jury where it was over your abdomen. A. You understand, when I was in the crowd it was much higher, hit me higher than that, with nobody against it.

"Q. I understand, but when you were laid across it, where did it catch you? A. Right here (indicating).

"Q. And were you able to get off of it? A. No, sir, I was not.

"Q. Were you conscious there of the fact that you were unable to get off that rope? A. Yes, I was.

"Q. Who helped you off of it—helped you off? A. Well, my husband, he was the one, I guess, who helped me; I would not remember distinctly, because I had the terrifying thought that the pushing crowd would stamp on me, and I didn't know what to do.

"Q. But you were not trampled on, were you? A. No, sir.

"Q. After you had gotten off the rope, where did you go? A. When they undid the rope—and I lost my pocketbook—and I fell on my knees, and a lady tried to help me; I was very weak in the legs—my legs positively shook; I could not stand up, and my mother-in-law and husband assisted me to some sort of seat by the stairway."

In telling of her nausea and suffering, she testified—

"I was excited, was shaking all over; I could not control my speech, could not do anything.

"Q. I believe you went down to the restroom? A. Yes, sir.

"Q. How long did you remain down there? A. Was down there at least thirty minutes.

"Q. Then you came back up and entered the show, and sat through the performance? A. Yes, we came up, and the usher was waiting for us, and seated us immediately.

"Q. And you sat through the performance? A. Yes.

"Q. Did you feel any discomfiture by way of pain? A. Yes, I did.

"Q. Throughout the performance? A. Yes.

"Q. After the performance you went home? A. Yes, sir.

"Q. Tell the jury whether or not you still were feeling discomfiture from that, that evening? A. When I got home, I felt awful bad; I had a terrific headache, my back was killing me. Of course, by abdomen hurt, my legs were still shaking, I shook all over; I trembled, and I experienced a terrible feeling that I can't express myself.

"Q. I will ask you whether you were able to see where the abrasions were on your abdomen? A. Very plain.

"Q. Tell where they were, where they ran or what they covered. A. Extended clear across by abdomen, right across here (indicating).

"Q. What appearance did it present, by the way? A. Black and blue, very black and blue.

"Q. Were there any other portions of your body or limbs that had abrasions? A. My arms, I worked them under (the rope) once; and worked them back out—and my thighs and—

"Q. (Interrupting) There were abrasions on those? A. Yes, slightly—the worst on the abdomen.

"Q. Had you prior to that time experienced these feelings you have been describing? A. No, sir.

"Q. State whether or not you were suffering throughout the night and morning, and still suffer? A. Yes, the worst was in the morning.

"Q. Were you able to get up? A. No, I was not able to get up.

"Q. I believe a doctor was called? A. Yes, sir.

"Q. When did he come to your place? A. Oh, it was about twelve o'clock.

"Q. He administered something to you? A. Yes, sir.

"Q. Did he examine you then? A. Yes, he examined me thoroughly.

"Q. Now, madam, what occurred on the day following, if anything unusual, with respect to you? A. The day of the 15th?

"Q. Yes. A. I experienced a miscarriage."

She testified she had been pregnant "since November that I know of." That prior to her pregnancy she experienced no pain or suffering when her menstrual periods were upon her, but that since her injury, and when her periods resumed and ever since, she has "terrific pains, my head bothers me, my back hurts and my disposition is bad; I am nervous—very nervous; these conditions continue through the period." She had no such symptoms at her periods prior to her injury.

On cross-examination she said she didn't fall backwards over the rope; that she suffered no nausea, nor pain, nor vomiting after she discovered she was pregnant. She felt bad in a general way, but not like she did after the injury. She had, with her husband, attended that theater about once a month since October up to the date of her injury. She had, on former occasions, had to wait only a few minutes, but never like she had to wait this time. They walked into the second lobby; there were ropes surrounding the crowd that was waiting to get into the main floor; plaintiff and her two companions waited within those ropes until the time of the accident. They joined the crowd from the rear; the crowd was facing to the west or towards the door through which they expected to gain entrance into the main floor. The three made no effort to get out of the lobby they were in or to leave the theater. The employees said

the show would be over in ten minutes. Plaintiff said she knew the regular time for opening of the (first) show was "around seven o'clock," that they got there between 7:30 and eight o'clock and she knew that the time for starting the second show was nine o'clock, She knew when they entered the second lobby that the seats on the main floor were filled and they would have to wait for some seats to be emptied. She testified that the location of the rope, as shown in defendant's photograph of the second lobby (Exhibit No. 3), "is altogether different from the night I was in the theater." . . . "There was a great crowd in there too." The rope shown in the photograph was to the best of her knowledge about the type of rope used that night and was attached at about the place where the extreme west door was. At one place in her cross-examination, she was testifying to the crowd wholly pushing, "no one directly behind me—everyone began to push." It was suggested to her by the cross-examiner that she "couldn't tell definitely that everybody did," and was by him urged to "tell what you know;" she answered, "I can't say truthfully that more than one or two, or several people, pushed." She felt a pressure, the people were surging against her. She said she couldn't tell whether it was one person or people pressing her. She turned her head to see who was doing it. Several people were behind her. She had a general idea but did not know who it was, she knew there were more than one, there was pressure back there and after the rope began tightening up on her she had trouble in getting her hands up. When her husband unfastened the rope she went down on her knees but the last fact had nothing to do with her getting hurt.

On redirect examination she described the force which caused her to be forced on the rope as "terrific." She was not able to resist it, she was "sort of draped over the rope" and tried to extricate herself but could not. She said that as she stood there (before being pushed over the rope) she could feel the pressure of the crowd increasing, she knew there was a crowd against her. Her husband got around to where the rope was fastened, she did not know how, and released the rope as soon as he could. There was no comparison between the crowd on this occasion and at times before, it was very large, she had never seen such a crowd in a theater before.

We have set forth the evidence in plaintiff's behalf with perhaps unnecessary detail and needless length. But it is thus done because of the vast difference between the views taken of it by respective counsel on both sides, and the different legal inferences and conclusions they appear to have drawn therefrom.

Appellant claims that its demurrer to the petition should have been sustained because it failed to state facts sufficient to constitute a cause of action against defendant. Aside from a statement in that part of the abstract known as the record proper showing that

on the second day of the trial after the jury had been empaneled and plaintiff had filed her reply to defendant's separate amended answer, "defendant filed a demurrer to plaintiff's *petition*" which was overruled and exceptions saved, there is no showing anywhere in the record of the filing of the demurrer nor of its contents. The trial was had on plaintiff's *amended* petition, the date of the filing of which is not shown nor is the date of the filing of defendant's amended answer stated, but it appears in the record *after* the demurrer is said to have been overruled. Without saying whether the above was sufficient to present the demurrer to the appellate court for consideration it would seem that by filing its *amended* answer to the *amended* petition and going to trial, defendant waived such demurrer. [Binswanger v. Employers' Liability Assurance Corporation, 28 S. W. (2d) 448, 453.] But if we may *assume* that the ground of the demurrer was to the *amended* petition and not to the original petition, then doubtless such a demurrer is not waived but can be raised at any time. However, we may say that as we view it, the petition did not fail to state a cause of action. Defendant, it is true, was not an *insurer* of plaintiff, but having taken her admission fee and having admitted her to the place prepared by it for her to wait until she could be given a comfortable seat with her companions from which to witness defendant's show, it was bound to exercise reasonable care, that is, care commensurate with the necessities and circumstances of the situation, to protect her against injury. Crane v. Kansas City Baseball & Exhibition Company, 153 S. W. 1076, 1077; Berberet v. Electric Park Amusement Company, 319 Mo. 275, 282 (the last cited case was based on the claim that the board causing the injury was loose and unfastened, and the defendant, in the exercise of ordinary care, would have discovered its unsafe and dangerous condition, but, as the Supreme Court said, "The evidence wholly fails to sustain the petition in that regard." And the judgment was reversed because of this). Plaintiff's evidence, in the case at bar, is not affected with that infirmity. See also on the point here considered, Oesch v. St. Louis Public Service Co., 59 S. W. (2d) 758, 759-60; Grubb v. Kansas City Railways Co., 207 Mo. App. 16.

As heretofore shown, the petition alleged that defendant operated the theater; that plaintiff's admission fee had been paid and she was an accepted patron and was in the place prepared by defendant for her to wait until she could be properly and comfortably seated; that while she waited in this place the crowd was allowed to come in and not only fill but congest the place in which she was; that although the manager and other employees constituting the management of the theater and having the duty to watch the crowd and care for the patrons' welfare, were present, they allowed an "additional number of patrons to enter the place and crowd the place to overflowing and to surge and press against her and push her into

such a position across the chain or rope provided to hold them in place, in such a way as the management should have reasonably known would be painful and dangerous, and they knew, or by the exercise of ordinary care could have known, of the congested condition before plaintiff was injured; that nevertheless they continued to admit persons which added to the crowded and congested condition; that under the pressure of the crowd and such congested condition plaintiff was helpless to protect herself, and was pushed over and across, or "draped" over, the rope; that the pressure was so terrific she could not resist it; that she was seriously injured, and her injury was not caused by her own fault or negligence. The petition sets this forth and the evidence in plaintiff's behalf supports the allegations of the petition. It would seem to be manifest that a case was made for the jury. The petition cannot be destroyed by picking out the words "filled to capacity and to the point of overflowing" and confining the effect of all the allegations therein to this narrow phrase and thereby contending that all that was alleged is that the place was merely filled. It is true the petition does not state in express and precise words that "the place was rendered unsafe" but it alleges matters which show that it was rendered unsafe and reasonably should have been known to be unsafe. The facts are wholly different from those in the case of Sullivan v. Ridgway Construction Co., 236 Mass. 75. And the case at bar does not rest on the mere fact that the room was crowded as in the case of Moulton v. Boston Elevated Railway Company, 236 Mass. 234. Although the court in that case said, at page 236, "the mere fact that a car is crowded is not *of itself* evidence of negligence" (emphasis supplied), yet a judgment for plaintiff was upheld.

The plaintiff's testimony, in its entirety, is not open to the construction that she was pushed over the rope, not by the pressure of the crowd, but merely by one or two persons who began pushing in an effort to get next to the door into the theater or auditorium proper. But even if the pressure against plaintiff was by the pushing of two or more, yet if that was the result of the pressure of the congested crowd in the roped-off space, it would not exculpate defendant since those coming directly in contact with plaintiff under those circumstances could be regarded as merely an intervening, though not an independent, cause. [Murrell v. Smith, 152 Mo. App. 95.] In this cited case, at pages 112 and 113, the court makes remarks as to the duty and obligation of managers of public entertainment which are applicable to the case at bar. The same is true of the case of Greeley v. Millers, Inc., 150 Atl. 500, 501, 502. We have carefully examined the cases cited in support of the contention that no cause of action was stated but find that, for various reasons, they are not in point.

The overruling of defendant's instruction calling for an instructed verdict in its favor at the close of plaintiff's case in chief, need not

be discussed since it was waived by defendant going on with its defense and introducing evidence and asking instructions in support thereof. [Davison v. Hines, 246 S. W. 295, 303; St. Louis v. Wright Const. Co., 210 Mo. 491; Frye v. St. Louis, etc., R. Co., 200 Mo. 377; Riley v. O'Kelly, 250 Mo. 647, 660.]

It is claimed, however, that the court erred in overruling the demurrer to the evidence offered at the close of the entire case and the question on this calls for an answer. But, in effect, it has been heretofore answered in the discussion of the point that the petition stated no cause of action. As in that feature of the case, so in this, we find that the cases cited by defendant, in support of the claim of error, are not in point, or at any rate do not support defendant's contention. For instance, in the case of Torian v. Parkview Amusement Co., 56 S. W. (2d) 134, the finding of the jury was for defendant; the plaintiff was riding upon a peculiar conveyance, the plaintiff assumed the ordinary risks attending thereto except such as arose through the negligence of the defendant and there was evidence that there was *no* negligence, and this supported the finding of the jury in favor of the defendant; there being no error in the instructions, the court affirmed the judgment. The plaintiff depended upon a mere presumption of negligence, but this disappeared in the light of the evidence that there was, in fact, no negligence. In the case of McGilvray v. Boston Elevated Ry. Co., 279 Mass. 65, the cause of plaintiff's injury was not the negligence of defendant, but the act of an individual over whom defendant had no control and for which it was not responsible.

Complaint is made of alleged error in plaintiff's instruction No. 1. It is first complained that the introductory portion of said instruction submits issues of fact unsupported by the evidence, contains a comment upon the evidence, and not only tended to confuse and mislead the jury, but submits an item of negligence not pleaded as such. The said introductory portion of the instruction is as follows:

"Gentlemen of the Jury: You are instructed that if you should believe and find, from the evidence, that on January 13, 1929, the defendant owned and operated the theatre mentioned in evidence, to which the public gnerally, if you so find, was admitted, upon the payment to it of its regular charge; and that, on said date, the plaintiff, having paid defendant its regular charge for admission, if you so find, was permitted by the defendant to, and that she did, enter said theatre; and that, at said time, *the defendant had stretched a rope or chain across the entrance into the aisles of said theatre,* for the purpose of preventing its patrons, if you so find, from entering that part thereof which was provided with seats for its patrons, until such time as the defendant might *order and direct;*" (emphasis supplied).

The part italicized as to stretching a rope is complained of as being a comment and as an item of negligence not pleaded; and the

other italicized portion, as to the ordering and directing of the plaintiff, is said to be without evidence to support it.

We see no error in the above quoted portion of the instruction. The language complained of is the same as that used in the petition, and both are fully supported by the evidence. In fact, the above quoted portion of the instruction is merely a preliminary statement made before submitting the case, and introductory thereof. The charge that the latter part thereof assumed that plaintiff was under the *orders and directions* of defendant and created an unfavorable impression against defendant, is without merit. The evidence shows that the rope was used for the purpose of holding the patrons in the lobby until the defendant was ready to let them into the theater proper.

The instruction immediately proceeds—

"And that the plaintiff, having so entered said theatre, as aforesaid, was compelled to, and that she did, for a time, if you so find, remain standing in the lobby thereof, and in close proximity to, and against, said rope or chain, if you so find;"

The same objections are made to this portion as to the first above set out. The evidence shows that when the plaintiff and her companions had finally reached the rope after entering the lobby, they had been therein for an hour and a half. They had paid their admission fee, and were in the place prepared for them to wait until the doors into the auditorium or theater proper were opened and the rope lowered or unhooked and the waiting patrons allowed to enter. Under these circumstances, what could plaintiff and her companions do but wait in the place where they were put by the defendant? It is true the defendant did not stand over them with a club and thus compel them to wait there, but in law they were required to do what they did unless they should rebel, create a scene and demand their money back, which as gentle folk they were loath, and indeed had no reason at that time, to do.

The instruction further immediately proceeds—

"And that, at said time, the lobby of said theatre, including that portion thereof wherein the plaintiff was standing, as aforesaid, if you so find, was filed to its capacity and congested with the defendant's patrons, if you so find;"

This portion does not state that the entire lobby was filled to its capacity and congested at the time plaintiff entered the lobby; though there was evidence that there were at least 500 people therein when she entered it. The same observation as to lack of error can be made to this portion as to the first above mentioned portion.

The instruction then immediately proceeds—

"And, if you should further believe and find, from the evidence, that thereafter, and while *said lobby* was *so filled to its capacity and congested*, as aforesaid, if you so find, the defendant carelessly and negligently caused, allowed and permitted a large and additional

number of its patrons to enter said lobby, and thereby, and then and there, if you so find, further crowded said lobby to the point of overflowing, if you so find;''

The objection made to this portion is that it tells the jury it may find that defendant—

''In allowing a large number of people to enter, *further* crowded the lobby to a point of overflowing and in doing so it necessarily presupposes a finding that the entire lobby was crowded to capacity at all times prior to the time the jury is permitted to find that the large and additional number of people was allowed to enter.''

It is asserted by appellant that not only is there no evidence of a crowded lobby prior to the time it is charged that a large and additional number of people entered, but that the evidence ''conclusively shows'' that the lobby was never crowded to capacity or to the point of overflowing *at any time.* The only answer we make to this is that the evidence hereinbefore set out at such length and with so much particularity, is to the contrary. Attempt is made to show that the instruction leaves the inference that the lobby was crowded to overflowing *at the time plaintiff entered,* but clearly this overlooks the words of this portion *''thereafter,* and while said lobby was so filled to its capacity.'' We think the instruction cannot be said to leave any such impression. The contention that there is no justification under the evidence that permitting an additional number of patrons to enter the lobby ''further crowded the lobby to a point of overflowing'' or even to capacity, is unsupported by the evidence, is likewise untenable. No doubt it is error to give an instruction containing or covering an issue with no evidence to support it, but that is not the situation here.

The said instruction No. 1 finally, and immediately after the last portion above quoted, concludes thus—

''And, if you should further believe and find, from the evidence, that, as a direct and proximate result of the negligence of the defendant in the *particulars* mentioned, if you believe and find from the evidence that the defendant was negligent in the aforesaid *particulars,* the crowd, consisting of defendant's patrons, if you so find, was pushed and swayed, and that said crowd was thereby cause to, and that it did, bear down upon the plaintiff, and thereby forced her against said rope or chain, if you so find; and, if you should further believe and find, from the evidence, that the plaintiff was then and there, by reason of the pressure from said crowd, if you so find, forced to bend, and that she was crushed to the floor and injured, if you so find; and if you should further believe and find from the evidence, that, as a direct and proximate result of the negligence, if any, of the defendant, in causing, allowing and permitting a large and additional number of its patrons to enter the lobby of said theatre immediately prior to and at the time the plaintiff was injured, if you find she was, by reason of and in the manner aforesaid,

if you so find; and, if you should further believe and find, from the evidence, that the plaintiff was at all times in the exercise of ordinary care for her own safety, then your finding and verdict should be in favor of the plaintiff, and against the defendant, and you will assess her damages, if any, in accordance with another instruction given you herein.

"The words 'negligence' and 'negligent,' as used in this instruction, mean the failure to exercise the degree of care that an ordinarily careful and prudent person would have exercised under the same or similar circumstances."

We are unable to see wherein this was a mere "roving commission." It will be noted that the heretofore quoted portion submitting the question of defendant's negligence in allowing "a *large and additional number* of its patrons to enter said lobby, *and* thereby, then and there, if you so find, *further crowded* said lobby to the point of overflowing" *immediately* precedes the portion above quoted and this is the only place where defendant's claimed negligence is specified, and it mentions *two particulars* wherein the jury may find negligence if it saw fit, namely, in allowing more patrons to enter, and thereby *further* crowded the lobby to overflowing, it is not seen wherein the phrase "in the particulars mentioned" occurring in the last portion above quoted, could mislead the jury into thinking that it referred to and included any other matters not so specified as negligence, such as the *stretching of the rope* or the *compelling of plaintiff to stand and wait*. The instruction, reasonably construed in the light of the pleadings and the evidence offered in support thereof, did not confuse or mislead the jury. Neither can it be properly said that the said instruction No. 1 is broader than both the pleadings and the evidence, or broader than either of them.

The defendant obtained seven instructions covering every phase of the defense, including contributory negligence and assumption of risk, the sixth of which (lettered H) dealt with assumption of risk by entering the lobby and joining the crowd, shows to what the negligence is confined by telling the jury that if they found that plaintiff was injured "by being jostled or pushed around by said crowd and against the rope referred to in evidence" without any negligence on the part of the defendant, then plaintiff was not entitled to recover.

The instructions, as a whole, we think fully, fairly and clearly submitted to the jury all the issues of fact necessary for their determination, and no reversible error appears in them or in the case. There being a case made for the jury, which has been properly submitted to the jury and it having found for the plaintiff, we can do nothing save to affirm the judgment. It is so ordered. All concur.