MINNIE C. TUTTLE, RESPONDENT, v. KLINE'S, INCORPORATED, A CORP., APELLANT.—89 S. W. (2d) 676.

Kansas City Court of Appeals.    December 2, 1935.

*Harry G. Kyle, H. G. Pope* and *Hume & Raymond* for respondent.

*Henry S. Conrad, L. E. Durham, Hale Houts, I. M. Lee* and *Wright Conrad* for appellant.

SHAIN, P. J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $1500. Defendant has appealed.

The facts show that plaintiff was injured on December 19, 1931, while attempting to leave the place of business of the defendant, a large retail establishment in Kansas City, through a revolving door. This door consisted of four wings or panels fastened to a vertical shaft. The wings were curved in the forward direction of the movement of the door, which was to the right. The panels were fitted with glass beginning about six inches from the top and extending to within three feet of the bottom. About midway of the door and in front of the glass in each panel were two circular horizontal rods. The wings of the door revolved in a circular enclosure or frame with an

opening in the frame to the inside of the store and another to the outside for persons to pass through in leaving or entering the store. The movement of the door on the shaft was free except for the rubber weather strips on the outer edges of the wings, which pressed against the sides of the enclosure with the effect of slowing down or controlling the movement of the door as well as furnishing protection from the weather. The door was operated by people using it and could not be turned in any direction except toward the right. The evidence relating to the size of the door and the openings is not definite for the reason that the court would not permit defendant to prove the dimensions of the door on the ground that there was no claim of defective construction of the door or of a defect therein. However, defendant's offer of proof, in this connection, recites that the diameter of the circle in which the door revolved was seven feet and the entrances to the door were four feet eleven inches.

The evidence further shows that defendant advertised a sale in its store inserting a two page advertisement in the daily papers particularly advertising a sale of women's wearing apparel for the afternoon that plaintiff was injured. The streets and all of the stores on that day were crowded with customers, the time being the middle of the Christmas shopping season.

Plaintiff went to defendant's store in response to the advertisement and made two purchases of women's wearing apparel. She had two packages and her pocketbook in her left arm as she started to leave the store through the Walnut Street exit by the use of the north revolving door. There was a large crowd in the store but no crowd therein around the door as plaintiff attempted to leave. The door was practically motionless and stood with one of the wings dividing the opening, when plaintiff attempted to enter it. She started into the door, having her left arm and perhaps a part of her shoulder in the opening, when three youths (two in one compartment of the door), whom she thought to be high school boys, suddenly came rushing through the door from the outside causing it to suddenly revolve with great force, resulting in the wing of the door striking plaintiff's elbow and to throw her suddenly against the door frame or the casing. Her wrist and elbow were caught between the wing of the door and the casing, forcing her hand in so as to injure her elbow, wrist and arm.

There is a controversy between the parties as to whether there was a crowd present at the outside of the door and, if there was, whether the rushing of the youths through the door was caused by the crowd attempting to enter the store, or, was merely action on the part of the boys, unconnected with the crowd, a matter that will be hereinafter discussed.

There were several allegations of negligence pleaded in the petition but there was no evidence to support any except the one submitted in plaintiff's instruction number one. Plaintiff's theory of recovery, as disclosed by this instruction, was that as plaintiff was attempting to enter the door it was suddenly and violently pushed against her "by a large number of customers of the defendant who were rushing and crowding to enter" the store by said door and that defendant was negligent in failing to place a guard or guards at the door to "regulate the traffic through said door and to regulate the speed" thereof.

It is insisted that defendant's instruction in the nature of a demurrer to the evidence should have been given, as well as its instruction number C, which sought to tell the jury that defendant was not responsible for any injuries that plaintiff received and that were "caused by the act or acts of persons attempting to enter the door from the outside of defendant's store." It is also claimed that the court erred in giving plaintiff's instruction one. We think that defendant's contentions must be sustained. Assuming, for the purpose of disposing of this point, that plaintiff was injured by the action of a crowd of persons entering the store, rather than the independent movement or action of the boys who actually revolved the door, we are of the opinion that there is no liability in this case.

The undisputed evidence shows that the door in question was of ordinary construction and use and that, if used properly by individuals, there was nothing dangerous about it, although it was dangerous if used by persons rushing through the entrance, especially if two or more persons got into one compartment at a time, the door being constructed for the purpose of accommodating but one person in a section. It seems to be well settled that the owner or the operator of a retail mercantile establishment, such as the defendant, if it exercises ordinary care in the construction and arrangement of its premises, including the doors and entrances thereto, is not responsible for the action of crowds of customers who use such premises or doors, as it is not held to be able to anticipate that they will injure one another. It is a well known fact that a large crowd of persons enter such stores, especially during the holiday season and when special sales are advertised, gathering around the counters and other places where such sales are being conducted and that those managing such stores ordinarily have no control over such crowds. "They (crowds) are an unavoidable feature of mercantile life in large cities." [F. W. Woolworth & Co. v. Conboy, 170 Fed. 934, 935; Lord v. Sherer Dry Goods Co. (Mass.), 90 N. E. 1153; Hunnewell v. Haskell (Mass.), 55 N. E. 320; Pardington v. Abraham, 87 N. Y. S. 670, 671; Olson v. Whitthorne & Swan (Calif.), 263 Pac. 518; Buzzell v. R. H. White Co. (Mass.), 107 N. E. 385; Smith v. Johnson (Mass.), 106 N. E. 604.]

Of course, we are not intimating that a proprietor of a store who sees an unruly crowd, conducting itself in such a way as well calculated to result in injury to a customer, has no duty toward such customer, but we need say no more in this case than that he is not required to anticipate that a crowd will so conduct itself.

We have examined the cases cited by the plaintiff and find them not in point. In the case of Greeley v. Miller's, Inc. (Conn.), 150 Atl. 500, defendant advertised a sale at a certain hour in the morning. It did not open its doors at that hour in consequence of which a crowd congregated in front of the doors in a narrow entranceway with windows on each side. When the doors were finally opened the crowd, rushing into the store, broke the windows causing injury to the plaintiff, a member of the crowd. There it appears that defendant invited the public to the store but would not let them enter it or try to control the crowd. In other words there was active negligence on the part of the defendant and it could have well anticipated the injury that occurred. In the case at bar there was no interference by the defendant with the movement or action of the crowd, if any, entering the store. Plaintiff was at liberty, at the particular time in question, to or not to use the door, as she saw fit.

The case of Marquis v. Goldberg, 34 S. W. (2d) 549, involved a stepping and falling into an unguarded stairway where the visibility was poor. The cases of O'Bauer v. Katz Drug Co., 49 S. W. (2d) 1065, Myers v. K. C. Junior Orpheum Co., 73 S. W. (2d) 313 and Grubb v. K. C. Rys. Co., 207 Mo. App. 16, are not in point. The last one was a passenger and carrier case. Plaintiff cites a number of such cases. All of them might be distinguished from this one on the facts. However, it is sufficient to say that in such cases, defendant being a common carrier, owes the passenger the highest degree of care or a different degree of care than is owed a customer by the proprietor of a retail store, which is ordinary care. [Burnison v. Sounders, 225 Mo. App. 1159, 1163, 1164.]

Plaintiff sought to show that there was a practice in Kansas City relative to guarding revolving doors for the purpose of controlling crowds using them; that such guards were provided by one bank, a newspaper, a hotel, four department stores and probably a drug store and a music store. One or two witnesses, who were employed as such guards, testified that a crowd would sometimes cause the door to revolve too rapidly and, in that event, they would stop it by taking hold of it and that where large crowds were present they would regulate the use of the door. A number of witnesses testified as to the practice, in this respect, of owners or operators of seven or eight of such doors but there is no evidence tending to show as to the extent of the use of such doors in Kansas City and the testimony is indefinite as to the duty of the person stationed at some of the doors concerning

which there was testimony. In one instance the guard was stationed fifteen feet from the door and in some others the witnesses were not in a position to say whether the person so stationed devoted all of his time to guarding the door.

However, when plaintiff first sought to show these individual cases where revolving doors were guarded defendant objected and now assigns as error the action of the court in permitting this character of testimony. Unquestionably it was not competent. Where the nature of the act is such that the question of negligence is doubtful, it is competent to show the practice, under similar circumstances, of reasonably prudent persons engaged in like pursuits. This is because evidence of uniform practice, if any, of such persons, in the performance, under similar circumstances, of acts like those which are alleged to have been negligently done, is generally competent because it presents to the jury the correct standard for their determination of the issue as to whether the defendant was guilty of the failure to exercise ordinary care, that being the measure of liability in the last analysis. [Brunke v. Mo. & Kans. Tele. Co., 115 Mo. App. 36, 39; Spencer v. Bruner, 126 Mo. App. 94, 102; Chi. Gr. W. Ry. Co. v. Eagan, 159 Fed. 40, 44, 45; 45 C. J., pp. 709, 710.]

However, "the practice of an individual cannot be admitted in evidence, either on the question of negligence in the act or omission in question or for the purpose of showing a general custom or usage relative thereto." [45 C. J., p. 1143.] "A general custom or usage cannot be shown by evidence of particular transactions unless sufficiently numerous to indicate a regular course of business or by evidence of a single individual," etc. [17 C. J., pp. 520, 521.] In Shields v. K. S. Sub. Belt Ry. Co., 87 Mo. App. 637, 644, the court said:

"Indeed, the existence of a usage could not well be proved by showing particular instances of transacting business in a certain way. The only proper method of establishing the fact is by the testimony of witnesses who have active and constant experience of the manner in which the trade was conducted in relation to the matter in controversy. Witnesses must testify to facts and not inferences deducible from them. He may testify that such was in fact the custom but not that such being the fact he should consider the custom so and so. [Lawson Usages and Customs, 101.] To prove the existence of a custom, something more than the judgment or conclusion of the witness called to support it is required. A custom is the result of usage and can only be properly shown by proof of the usage from which it may be claimed to be derived. [Gallup v. Lederer, 1 Hun. 282.]"

Defendant, having objected to testimony of this character, was not required to repeat the objection. But even had there been no objection the evidence was not sufficient to show the practice of other individuals, generally, and consequently of no weight. From what we

have said it is not necessary for us to discuss the matter as to whether this case comes under those where the nature of the act is such that the question of negligence is doubtful and, therefore, a case where the practice of others, operating like doors, is properly shown.

We, however, find that plaintiff asked her witness, Woods, who was stationed at a revolving door at a newspapers in Kansas City and who also, at one time, worked for a large department store in that city and who stated that he was acquainted with revolving doors at two other places, or four places in all, "Q. Mr. Woods, do you know whether or not there was a custom in Kansas City, Missouri, during the rush trade, where the stores used revolving doors, whether or not it is a custom to have a man there to control the swinging of those doors?" The question was objected to on the ground, among others, that the witness had not shown himself qualified to testify as to the custom. The objection was overruled and the witness answered "yes" to the question. Whether the answer should be taken as meaning merely that he was acquainted with the custom or that the custom was to have a man at a revolving door to control the swinging thereof (but assuming that it was the latter) it is quite apparent that the witness was not qualified to testify in reference to the matter. The objection should have been sustained. "A witness will not be considered competent whose knowledge is confined to the practice of certain individuals, only." [17 C. J., p. 525.] But even had it been the duty of defendant to station a guard at the door in question, it could not be successfully contended that its failure in this respect was a proximate cause of the accident, because there would have been no opportunity for such a guard to have stopped the door before plaintiff was injured. The starting of the door and injury to plaintiff was almost simultaneous. In fact, plaintiff testified that she was not injured by reason of the door "spinning." A guard to regulate the flow of the crowd through the door is another question, of course, but the above question propounded to the witness, Woods, does not cover that phase of the case.

However, plaintiff in support of her contention that individual instances are sufficient to show a practice cites Crawford v. Stockyards Co., 215 Mo. 394. That case merely involves the duty of the defendant to regulate his conduct, in view of his knowledge of the practice of another, or a number of individuals of whom plaintiff is one, so as not to injure the plaintiff. Of course, that case has nothing to do with the showing of a practice among men, under similar circumstances, in a given line of endeavor as bearing on the question as to whether a particular act of one of them is negligent.

However, it is a very serious question as to whether there is any evidence tending to show that plaintiff was injured by the operation of the crowd, indeed, if there is any evidence tending to show that

there was a crowd present before plaintiff was injured. As before stated, the evidence shows that there was no crowd *in the store* around the door in question.

Plaintiff testified:

"I went to enter the door I had my package in my arm this way (indicating), and the wing of the door came around. It just seemed I had no more than entered it than a sudden rush, and hit my elbow."

"Q. *And then as you entered it and got caught did you then look on the outside?* A. *Yes.*˙ Q. Tell the jury what you saw on the outside there. A. It seemed all at once there was quite a few people trying to enter the store and I particularly noticed some high school youths rushing into the wing or were in the wing. I was caught there and the crowd kept gathering and gathered up on the outside and they couldn't see why they couldn't get in and they kept pushing against the door trying to get in. Q. All that time was your left elbow caught against the wing of the door and the doom jamb? A. Yes. Q. And how many people would you say were pushing on the outside? A. I couldn't say how many. I was in such pain and agony I just remember seeing people, just a crowd. Q. Do you know how many people there were in the section; you spoke about some young men, some students. How many of them were in the sections? A. There was two or three of them in there. Q. I see. When your arm was caught? A. Yes." (Italics ours.)

She testified that she finally screamed and a lady shopper prevailed upon the crowd to stand back so that plaintiff's arm could be released. Plaintiff further testified:

"Q. Do you recall what the construction of these doors is Mrs. Tuttle? A. Yes, there is four panels. They are shaped to curve this way (indicating). Q. What are they made of? "Glass, aren't they? A. Glass and wood. Q. From about three feet from the floor to almost six inches of the top they are glass, are they not? A. Yes. Q. And you can see all four of them are glass? A. Yes. *Q. You can easily see from inside the street outside?* A. *Yes, you can see through.* Q. *You can see the people on the outside?* A. *Yes.* Q. *And you can see whether there was a crowd or wasn't a crowd?* A. *Yes.* Q. *How many people would you say you noticed out there before you got to the door?* A. *I wasn't noticing how many people. People were coming and going and I couldn't say how many.* Q. *Wasn't it the usual trend of people?* A. *About the time I entered the door it was.* Q. *That come and go out of the stores?* A. *Yes.* Q. *Nothing unusual about it?* A. *Well, it was an unusual day.* Q. *I mean at this particular time there wasn't any unusual crowd outside of the seasonal crowds?* A. *No, not at the time I entered the door.* . . . Q. There was nothing unusual other than people coming and going like a busy store always has? A. Yes. *Q. So you noticed nothing out of*

*the ordinary all around that door that day?* A. No. Q. Did you notice any crowd behind you? A. When the lady released me from the door people came from everywhere, seemed like there was an awful crowd. Q. As you walked up to the door before the accident? A. I don't remember any great crowd. Q. You were being jostled by the crowd? A. I wasn't thinking about the crowd. I was going out." (Italics ours.)

Plaintiff further testified that there was a corridor, leading from the lobby where the display windows were on the outside, to the door in question; that this passageway was perhaps twelve or fifteen feet in width and that the corridor was wider than the door "any way two or three feet" on each side of the door.

"*Q. Now, as you walked up to the door did you notice any people on the other side coming up to the door? A. Not at the time I entered it, no. Q. You just didn't notice it at the time? A. I didn't notice. Q. When you were caught did you notice any people? A. Yes; it seemed like the people just came all at once.* Q. Did you see any particular person pushing on a wing of the door? A. There were some high school boys pushing in the section just opposite this way (indicating). Q. They were still so they could go out, however? A. No, they couldn't get out. They were trapped in, you see. Q. Were they in there when you walked to the door? A. No, they came there evidently—I have always thought they gave the rush into the door, is what caught me, but I couldn't say for sure because it happened so suddenly. Q. If the door was stationary, they weren't in the door as you walked up? A. No. Q. If they were trapped in there afterward, they must have been the ones that pushed the door? A. They entered into the door." . . . .

"Q. How many of these boys did you notice? A. I would say there were three altogether but I won't say all three was in that one wing. Q. Do you recall how many were in there? A. There were two in there that I know of. Q. Two in that section? A. Yes. *Q. Did you see them prior to their coming into the door? A. Not before they entered the door, no.*" . . . .

"*Q. Did you see any other people besides these boys? A. Yes, lots of people trying to get in, outside, by that time. Q. But your getting caught kind of held up the usual flow and some people congregated?* A. Yes, they were congregated and pushed against the door, wondering why it wouldn't go on. Q. Were the boys continuing to push to come through after you were caught? A. Yes, they were pushing. Someone was pushing. Q. Your idea of how this accident happened is that just as you got there these three boys entered and shoved the door about a foot and a half and caught your elbow? A. Yes, that that is my impression. *Q. It wasn't caused by the door spinning, or anything of that kind? A. No. Q. It was merely this push by these*

*boys? A. It was incoming crowds. Q. Incoming people caused the door, the wing, to move about a foot and a half and hit your elbow and catch your wrist? A. Yes. Q. That is about your version of the accident? A. Yes. Q. Of course you could, if you had been looking, readily see the people on the outside, could you not, through these glass doors? A. Yes, I was looking through.*" . . . .

"Q. You didn't see a crowd out there until the door had caught you and pinned you; then you saw a large crowd on the outside? A. Yes. . . . . I have always been very cautious of those doors. Q. For some reason you didn't at this time? A. Yes, I was cautious enough but I stepped into the door and I had no control over the *incoming crowd.*"

"Q. You didn't expect such a crowd and such a rush as you started out there, did you? A. Not at the time I went out, no. Q. Was there space enough left to let you get in? A. There was but the awful force prevented me from getting in." (Italics ours.)

Plaintiff's daughter testified that she was immediately behind her mother when the latter was injured.

"Q. Now, just describe in your own way about how your mother got hurt. Did you see her as she stepped up to the door? A. *Well, she stepped up to the door and the crowd came rushing in. They seemed to be in quite a hurry, and pushed her up against the door. It was all so sudden I don't know exactly how it happened.* She screamed and the woman pushed the door back and told them to get back, and her arm had been caught up against the door. Q. Before your mother started to step in was the door moving fast or slow or standing still? A. It was moving rather slowly. Q. *Did you notice the crowd on the outside before your mother got caught? A. No.*"

. . . .

"Q. *Can you tell the jury about how many people there were that rushed in that door? A. There was quite a crowd; quite a few people rushing for the door.* Q. You said it was going kind of slow when your mother started in. Describe the movement after these people on the outside got in it. A. *She stepped into the door and all of a sudden there was a rush, the people on the outside seemed to come very quickly, and they seemed to be in a terrible hurry and it seemed to be going extraordinarily fast until it was stopped by her arm.*" . . . .

"Q. *The crowd was pushing from the outside to get in? A. Yes.*"

Plaintiff and her daughter were the only witnesses to the accident. It is apparent from plaintiff's testimony that there was nothing to prevent her from seeing through the door but that she did not look until she entered the door and was caught. She even testified that she did not see the boys prior to their getting into the section. So there is no question but that she was not looking before the casualty occurred. She testified that about the time that she entered the door

and, before she got caught therein, she noticed only the usual flow of people through it. It is true that she and her daughter stated that there was a crowd outside of the door immediately after plaintiff was injured. But this is no evidence that there was one before that time for the reason that it was a busy day and there were large crowds on the streets and in the store and, owing to the fact that there was a flow of people through the door and into the store, no doubt it would take but a very short length of time for a crowd of people to assemble on the outside of the door after the movement of the door was stopped by plaintiff being caught in it, especially, since it is a well known fact that a crowd will quickly assemble when a casualty of this kind has occurred.

But even were there a crowd present immediately before plaintiff was injured, in order for her to recover under the allegations of her petition and under her instructions, it was necessary for her to show that the crowd, in some way, caused the boys to be pushed into the door and that their conduct was not an independent act of their own. In other words, that the crowd caused the boys to rush the door, rather than that act being of their own volition. Plaintiff and her daughter made statements in the nature of conclusions to the effect that incoming crowds or a crowd on the outside caused the door to revolve against plaintiff, but the *facts* detailed by them show that their conclusions had no substantial basis. Both of them testified that they did not take any notice of the conditions on the outside of the door prior to the time plaintiff was injured. Even if they thought there was a crowd there before the injury, on account of the sudden appearance of the crowd after that occurrence, as before stated, the fact that there was a crowd present after the injury is no proof that there was one before.

However, if plaintiff's testimony that it was the "incoming crowds" that caused her injury is to be taken as a statement that she saw the crowd through the door before her injury, then it is inconsistent with her statement that she was not looking before her injury and the jury could not consider her testimony that the incoming crowds caused the injury or the testimony of her daughter to a like effect. [Steele v. Railroad, 265 Mo. 97; McCoy v. Home Oil & Gas Co., 60 S. W. (2d) 715.] This is true, although, as a general rule, we take all of the evidence in its most favorable light to the plaintiff in discussing the propriety of a demurrer to the evidence.

On the other hand, if plaintiff's testimony, that it was the "incoming crowds" that caused the door to revolve against her, was for the consideration of the jury, for what it was worth, regardless of her other testimony that she was not looking, then she must be held to have seen the crowd "rushing the door," to use the language of plaintiff's brief and, as she was not forced to use the door (there be-

ing no crowd pushing her), it would be a difficult matter to arrive at any other conclusion than that she was guilty of contributory negligence, as a matter of law, in going ahead into the door. While contributory negligence was not pleaded if such negligence was shown, as a matter of law, in plaintiff's testimony advantage may be taken of it by the defendant. [Sissel v. Railroad, 214 Mo. 515.]

Plaintiff, having failed to make out a case, the demurrer to the evidence should have been sustained. Therefore, the judgment is reversed. All concur.

### ON REHEARING.

SHAIN P. J.—This cause was argued and submitted to this court at the October term, 1934, of this court and at the January call, 1935, an opinion was handed down by Judge BLAND reversing the judgment.

Thereafter, a rehearing was granted and the cause was reargued and re-submitted at the October term, 1935, of this court.

We, on rehearing, have gone carefully over the records and given consideration of points raised on rehearing and conclude that the result reached by us, in the former hearing, is correct.

We, therefore, adopt and hand down the opinion as written by Judge BLAND and approved and handed down on January 7, 1935, as the opinion of the court and the judgment is reversed as adjudged and directed in said opinion. All concur.