CORNELIA SAMMONS HALE ET AL. v. KANSAS CITY, MISSOURI, A MU-
NICIPAL CORPORATION.—187 S. W. (2d) 31.

Kansas City Court of Appeals.   April 2, 1945.

*William E. Kemp, David M. Proctor* and *Arthur R. Wolfe* for plain-
tiff in error.

*Howell, Jacobs & Howell, Virgil Yates* and *James W. Broaddus* for defendants in error.

DEW, J.—This suit was brought in the Circuit Court of Jackson County, for damages alleged to have been caused by the flooding of a four-story building belonging to the defendants in error in Kansas City, on June 27, 1941, which damages are claimed to have been the direct result of alleged negligence of the plaintiff in error. Upon trial to a jury, verdict was rendered in favor of the defendants in error in the sum of $4000. Judgment was entered accordingly. Appeal was thereafter taken, later dismissed, and the cause is now before us on a writ of error issued at the instance of plaintiff in error.

The defendants in error and the plaintiff in error will hereinafter be referred to as plaintiff and defendant, respectively, in which capacities they appeared in the trial court.

Plaintiffs' petition in substance alleged that on June 27, 1941, and long prior thereto, they were the owners of the building and real estate situate at 3017-19 Wyoming Street, Kansas City, Jackson County, Missouri, occupied by the Central Bag Company; that on said date said Bag Company carried on its business of manufacture

and sale of bags, cards and boxes, and had a large amount of various kinds of property in said building; that there were installed in said building, among other equipment, a sprinkler system and boiler, and on said date and on the following day said building and equipment were damaged by the negligence of defendant in permitting the storm sewers, operated and controlled by defendant in the vicinity of said building, to become flooded so the said sewers would not carry off the heavy rain then falling, and as a result of said negligence said water entered said building and damaged the same, causing walls and floors to crack, and injuring said sprinkler system and other equipment; that said storm sewers were controlled and operated by the defendant, together with the flood gate in connection therewith, over which plaintiffs had no control, but which were wholly and exclusively within the control of defendant, its agents, servants and employees; that the exact cause of said storm sewers backing up and flooding, and causing water to flow into the plaintiffs' premises aforesaid to the depth of several feet is unknown to the plaintiffs, but such knowledge is peculiar to and in the possession of the defendant; that such damage would not have resulted but for the negligence and carelessness of the defendant in the operation and control of said storm sewer system in the vicinity of plaintiffs' property; that as a direct result of said negligence of the defendant in permitting the said storm sewers to flood or back water into said building and premises, said building and equipment therein were damaged in the sum of $1500. Plaintiffs further alleged the giving of legal notice to the defendant prior to the action.

The answer of the defendant was a general denial.

On the first day of the trial, June 2, 1943, plaintiffs, by leave of court, amended their petition by interlineation, changing the amount sued for to $4000.

That part of the evidence which is undisputed is as follows:

The plaintiffs are the owners of the building and premises described in the petition. It is a four-story brick and mill constructed building located at 3017-19 Wyoming Street, Kansas City, fronting westward on Wyoming Street; that it was built about 1901, and for many years after its construction, was used by its original builders and owners in connection with the manufacture of mattresses and related articles, necessitating storage, machinery, and heavy loading of all parts of the building. On the south side of the building and as a part of the premises was a parking lot. There was a loading door some twelve feet wide on the south side of the building, leading into the basement. The base of this door is slightly lower than the highest point in the adjacent parking lot, and there is a drainage ditch about eight inches wide just outside of and along said doorway, and another drain in the said parking lot about twenty feet away at a lower point in said lot. The building, while constructed as one building, is referred to as

consisting of the "north" and "south" buildings, the floor level of the bottom or basement floor of the north half of the building being some two or two and a half feet higher than that of the south half of the building. The present tenant, the Central Bag Company, has occupied the building since 1937. The bottom floor level is covered with concrete. The immediate grade to the loading entrance door into the building from the south parking lot is slightly toward said door.

Between 1919 and 1922, defendant designed and constructed a sewer project known as the Turkey Creek Sewer, to prevent the overflow of Turkey Creek and the flooding of the vicinity thereof. The project involved changes in the channel of said creek, diversion of its natural flow into other channels by ditches and drains, and a flood gate to prevent backwater from the Kaw River, so as not to thwart the protection afforded by the new dike construction at the Kaw, and a pumping station to force surface waters from the area into the Kaw through supplementary channels when the high waters of the Kaw made it necessary to close the flood gate in the main sewer. The system also included all necessary laterals, connections, manholes, catch basins and other parts essential to a complete sewer system. Accordingly, Turkey Creek Sewer District was established, in which plaintiffs' property is situated. The pumping station was located at 28th Street and Southwest Boulevard. Thereafter, between 1919 and 1922, the said sewer project was constructed and was at the time in question owned, maintained, and under the control of the defendant city. The purpose of the city ordinance authorizing said project was stated therein to be "in order to completely and successfully sewer and drain the area embraced within said Joint Sewer District."

The diameter of the sewer that goes into the pumping station is sixty inches. From the direction of Kansas City proper and located in Southwest Boulevard, is a sewer thirty-six inches in diameter, which joins with one from another direction, fifty-four inches in diameter, both emptying into the said main 60 inch sewer through the pumping station, which, in turn, empties into the main Turkey Creek Sewer, twelve feet, ten inches in diameter, leading to the Kaw River.

On one side of this pumping station there is installed a sluice gate five feet in diameter which, when lowered, closes the 60 inch sewer. The gate has a screw gear on it which, when turned, raises or lowers the gate as desired, and when so raised, the gate opens the sewer for flowage. The raising or lowering of the gate is done by means of a rod with a T-handle, operated from above.

The purpose of the gate was described by a witness, employee of the Engineering Department of the defendant, as follows:

"A. Well, this particular sewer is connected to the main Turkey Creek sewer which goes through the levee from 23d Street produced in the Kaw River. When the river is below 23 gauge on the Hannibal bridge, any water which comes off Southwest Boulevard would pass

through this sewer and through the Turkey Creek sewer into the Kaw River. Should the river rise above that gauge water will back up from the river and would back into the sewers on Southwest Boulevard. In that case when the river is above 23 gauge we close this gate to prevent the water from backing up out of the river, then the water that comes from the boulevard sewers comes to this gate and would pile up if the pumps in the pumping station were not started to force it around and into the sewer .. . When the gate is closed the water would. be backing up this way (indicating), then the water goes through these screens, against iron bars or screens to keep out large pieces of debris that would foul the pumps. In that case the water divides on each side of the pumps which are open, and the pumps are started and they force the water into another line which leads right back into the Turkey Creek sewer and we pump against any pressure that there might be there.

"Q. From the river? A. Any pressure from the river, yes."

The witness explained that without the provisions for closing the big sewer, the backing up of the river overflow into the sewer would obviate the benefits of the dikes at the Kaw River in case of flood.

Plaintiffs' witness Mr. Kane, former night watchman for the Central Bag Company, tenant in the building at the time, testified that when he went to work at said plant at 5:00 P. M. on June 27, 1941, it was raining; that he first noticed water in the basement of the "south" building; that it was coming under and through various parts of the closed folding doors at the loading entrance on the south side of the building; that currents of water were coming from the parking lot adjacent to the building on the south, and from Wyoming Street on the west; that it came into the yard from the street and "right down into them back doors into the building;" that the bottom of the door is slightly lower than the highest part of the parking yard or lot; that he opened the loading doors in order to move a truck outside; that the water was then four inches deep on the basement floor in the "south" building; that before he could get the truck out the water had reached the gasoline tank located under the seat of the truck, and prevented the starting of the motor; that the gasoline had to be drained out of the truck and the truck was pulled out the next day by another truck; that on the evening of the flood, when he found he was unable to get the truck out on account of the water, he called the superintendent of the company, who soon came to the plant, as did several other of the employees; that there were then about two feet of water in Wyoming Street and in Southwest Boulevard, a short distance from the building; that the witness and others worked all night in the basement to relieve the flood conditions; that they obtained a pump from a machine shop on Southwest Boulevard and pumped water all night from the basement; that at about 3:00 or 4:00 o'clock in the morning (June 28th) the flood waters receded

in the streets; that the water in the basement had finally reached a depth of four feet in the "south" building and about three feet in the "north" building; that at the highest point in the basement of the "north" building, the water was about twelve or fourteen inches deep; that the pumping of the water in the basement continued all the next day (June 28th) and that evening; that as the water was pumped out, slime, mud, slush, paper and other such materials which had been washed in by the flood were found scattered and spread over the floor.

The witness further testified that he saw the current of flood waters coming along Southwest Boulevard and toward plaintiffs' building; that there are catch basins located on Roanoke Road just a block to the west, and also at the corner of Southwest Boulevard and Wyoming nearby; that water also was coming from Roanoke Road along an alley toward the building; that during his employment there from November, 1940, to March, 1943, he had never seen water in the basement of said building except on the one occasion described, although he remembered other heavy rains during his said employment before and since June 27, 1941.

On cross-examination, Mr. Kane stated that about two or three months after the date of said flood, a concrete slab or barrier about eighteen inches high had been built across the lower part of said loading door opening; that there was a "little" grade from the parking lot toward the loading door. He stated that water also came in through the office door on the west or front side of the building, but none from the east side nor, so far as he knew, from the north side of the building.

Another employee of the Central Bag Company, Claud Mason, was a witness in behalf of plaintiffs. He stated that he had been employed there nine or ten years. In substance he stated that when he first learned of the flooding of plaintiffs' building he was in a drug store close by said plant at about 6:00 o'clock p. m. on June 27, 1941; that the streets were then "full" of water. When he came out the water was up to the running board of his automobile; that he immediately went across the street to plaintiffs' building and down to the first floor; that Mr. Kane, the watchman, was there trying to get the truck out of the building; that the water was then about forty inches deep in the basement of the "south" building, and ten or twelve inches deep in the "north" building; that he attempted to move some new merchandise up on the small elevator but the water had loosened the cables and he was unable to move but a little of the merchandise; that the big elevator was already under water; that he worked there until 10:30 or 11:00 o'clock in the evening, then went home so that he might return early the next morning; that when he left they were pumping water out of the building and were still pumping when he returned the next day, and for several days thereafter; that when he

went home at 10:30 or 11:00 o'clock of the evening of the flood, the water was still in the streets; that the current was coming from Southwest Boulevard into the parking lot south of the building; that the force of the water moved a small steel tank from the premises of the Southern Oil Company across the street to the property adjoining the plaintiffs' property on the south; that water was still being pumped out of the elevator pits the following day and evening, as they kept filling up with water; that during all of the time of his employment in said plant he never knew of any other instance when water came into the building, although he remembered many heavy rains.

Other witnesses for plaintiffs testified substantially as witnesses Kane and Mason. Plaintiffs' further evidence tended to show that when the building was built some forty years ago, it was used in the manufacture of furniture and mattresses; that when so used there were kept in said building hundreds of bales of cotton weighing six or seven hundred pounds to the bale; that two or three thousand bales had been in the building at one time on many occasions during the years when so used, and same were situated on all floors wherever possible, even on the office floor on the north side; that the construction of the building is rubble stone and regular mill work construction with an iron cap on the top of each of the posts, and heavy concrete bases for the posts; that when the building was leased to the Central Bag Company in 1937, there were some cracks in the walls on the outside, but which did not extend through the walls; these cracks were pointed up at the time; that the roof was in good condition and slanted "quite a bit" to the east; that the water from the roof flows into two main outlets at the back or east end of the building about fourteen inches wide; that the posts in the building are set on top of each other clear to the roof so that if one drops or sinks, those above it will do likewise, resulting in the pulling of the building loose from the walls at every angle; that the joists, being fastened on the beams, lower when and to the extent that the posts or supports are lowered; that there are manholes and storm sewers along Southwest Boulevard, one at the corner of Wyoming Street and Southwest Boulevard, and one nearby on Roanoke, the nearest street west; that there was nothing wrong with the storm sewers in the vicinity that would prevent the carrying off of the flood waters; that on account of these sewers and manholes the plaintiffs had never had any trouble with water getting into their building prior to June 27, 1941, and that in addition thereto, in about 1920, the Turkey Creek Sewer project, with pumping station, was installed, and satisfactory flood protection to the vicinity had been afforded ever since.

Plaintiffs' evidence further tended to show that after the flood in question it was found that three of the pillars or posts supporting the "south" building in the basement and two in the "north" building,

had been twisted out of line and had sunk six or seven inches; that the footings or foundation under the same had been softened from the water which had seeped in and around same during the said flood, causing the sinking, and permitting the entire building to give way in many places, and the walls to crack throughout their thickness from the top to the foundation; that cracks were made in the front of the building, the south side and on the interior; that these cracks were not there before the aforesaid flood; that the pilaster or pillar in the front of the building was pulled in considerably; that in the office a post dropped onto the sprinkler system and the water system, and pulled all the plaster from the room, which was about 108 by 36 feet; that in some places cracks were made big enough to lay one's hand in them; that some of the doors were settled at such angles that they could not be opened or closed until the door openings were jacked up; that several new pipes had to be installed in the sprinkler system because of threads being twisted out of them by the weight, and repairs were made where the plumbing was caused to leak; that somewhat over $1200, had already been spent in making the repairs.

It was further testified that the sanitary sewers would cause some of the water in time to seep away if the storm sewers are not working, and if it were not for the storm sewers in the streets the water would seep into basements and out through the sanitary sewers, a very slow process; that there are two drains in the parking yard south of the building, one south of the boiler room, and the other right at the loading door; that the drain from the yard enters the sewer at the low point in the yard, and in addition to that, and the drain in front of the door, there is a ditch along the south edge of the parking lot; that the sewer openings on Wyoming between Southwest Boulevard and a point just beyond the plaintiffs' building are six in number, all within a short city block; that since the flood in question, plaintiffs have built a wall along Wyoming, beginning from the southwest corner of the building, south as far as the lot runs in that direction; that the wall is six inches through and three feet deep, and in some places extends twenty-eight to thirty-eight inches high; that the rental rate under the lease is $337.50 a month or $40500 for the ten year term; that the rental was not decreased after the flood; that altogether four of the supporting columns in the basement of the south half of the building and two in the north half appeared to be pressed down into the earth after the flood, and the other twenty-six appeared all right; that the crack in the north wall was discovered four months after the flood, while repairs were being made; that the downspout in the northeast corner of the building empties into and is drained off in a ditch parallel with the east line of the building; these outlets were never connected with the storm sewers; that the grade of the lot is above the bottom of the windows on the first floor on the south side of the building; that the items of expense for re-

pairing the building to date since the flood were $800 for shoring up the pillars or posts and righting them; $43.10 for repair to the sprinkler system; $25.45 for material for concrete; $60 or $70 for plumbing repairs, and some additional expense for cleaning up the premises; that some two years prior to the date of the flood, repairs had been made to the building, including shoring up one or two of the wooden columns in question in the "north" building.

In a former deposition of plaintiff Milton L. Sammons, he had testified, among other things, that the plaintiffs had had the building loaded to capacity, and that some trouble had been had with the timbers on the north side of the building before the flood; that the total expenditure for repairs growing out of the flood had been $1295.75, of which at the time of the deposition, $1045.75 had been paid out, and that about $200 more would be necessary. This witness at the trial stated that at the time of the deposition he had in mind nothing but the office cracks in the plastering. He testified that there was no damage to a $9000 printing press belonging to the tenant in the north part of the basement; that since the suit was brought he has been advised by builders that it would cost from five to six thousand dollars to complete the repairs; that the repairs to the cracks in the walls will yet have to be made through the entire thickness of the same, as well as some additional plastering and painting.

Expert witnesses for the plaintiffs estimated the cost of the repairs to be in excess of $5000.

Witness Robert Gibbs testified for plaintiffs in substance that he lived at 2801 Southwest Boulevard, across the street from the Southwest Boulevard pumping station; that he was returning to his home on Friday evening, June 27, 1941, and was unable to reach his home on account of the water in the streets thereabouts; that he waded for some distance from his car to his home, arriving there after 10:30 P. M.; that his own home was flooded; that the next afternoon (Saturday) he met an employee of the Central Bag Company on Southwest Boulevard and they approached a sewer gang trying to open up the sewers with rods; that the men were trying to obtain hose to flush the same, but were unable to get the hose hooked up; that he knew a colored man working with the crew and said to him: "I believe that gate is closed over there." He then asked if they could get into the pumping station enclosure and the colored man answered that they could. Witness then said: "Well, let's go over and see." He stated that they then went over and entered the enclosure of the pumping station, raised the lid on the side of the gate toward the boulevard, and found the reservoir underneath full of water; they then went to the other side, which was the Kaw River side, and found no water on that side; that then the boss in charge decided the gate was closed, and ordered the gang to get the key rod which opens and raises the gate; that the gate is on a chain drive or cog drive, and by turning

the key the gate is raised; that witness helped them open the gate on the northeast corner of the pumping station and immediately the storm waters rushed quickly out through the gate opening into the main sewer leading to the Kaw River; that there was strong pressure against the gate and they were unable to raise it very fast; that then the gang put the tools away and left.

On cross-examination, Mr. Gibbs testified that when the gate was raised, there was still some water on the streets and on the sidewalks, but the street cars were then running because the tracks were higher than the other parts of the streets; water was still standing a foot away from the curbs, and standing water could be seen in the manholes; that early Saturday morning (June 28th) the water had gone down quite a bit, and the city was pumping water out of his basement and several other basements, and onto the boulevard, but the flood gate had not yet been raised at that time. He believed the street cars resumed running about 11:15 p. m. Friday night (June 27th); that the water was not all out of the basement of witness's house by Saturday morning, but was off of the upper floors; that men worked in his home until noon, pumping, and there were men working in the streets all night; that when he arrived home Friday night (June 27th), boys were swimming in his basement, and a street car was stalled in front of his house.

Sol Katz, an employee of the Central Bag Company, testified for the plaintiffs and stated that he saw witness Gibbs on Southwest Boulevard Saturday afternoon where a city labor gang was trying to open up the manholes, and that he went with them to the pumping station and saw them remove the lids, and Gibbs pointed out to him that the manhole at the station on the side nearest the boulevard was full of water, and that the one on the opposite side was dry; that he saw the men get the T-rod and several of them fitted it and turned it, and that he asked one of the men of the gang named McKay if that was where the trouble was and the man answered that it was, "that he had left a man in charge to open this, but he evidently didn't do it;" that the gate was then opened and the water immediately started to run through the manhole closest to the boulevard; that after the gate was opened, the gang left. He testified that they were still pumping water out of the Central Bag Company building on Monday (June 30th), where water was still in the elevator pits.

An expert witness for the plaintiffs testified to the effect that it would cost about $5000 to put plaintiffs' building in the condition in which it was prior to the flood damage; that he had negotiated the lease to the Bag Company and knew of his own knowledge that such cracks as were in the building at that time were only surface cracks and did not extend through the walls; that the building was "perfectly dry" at that time; that the building, in his opinion, prior to the flood was worth $40000, and after the flood it was worth

$35000; that some of the upper pillars are still somewhat twisted. He stated: ''This building today renting for $337.50 a month, if it didn't have this lease on it would rent for $600 a month or $700 a month.'' This he explained was due to the fact that good care had been taken of the building and the sprinkler system had been completed, the elevators changed and the roof kept intact.

Defendant's evidence tended to show that at the time of the flood the second and third floors of plaintiffs' said building were carrying a load of about 200 pounds per square foot, whereas the building was designed to carry not more than 100 pounds per square foot; that 11,507 gallons of water must have fallen in plaintiffs' parking lot during the rain in question, and 187,000 pounds of water on the roof of the building; that the walls were already badly cracked, due to settlement of the foundations; that the settlement was caused by the overloading, or by poor design of the building, or both; that the flooding of the basement as described in the testimony would have no effect on the wood columns because of the lack of any current; nor would it have any effect on the concrete footings, or pedestals of the columns, nor on the rubble rock or stone underneath the pedestals that supported the columns, if the foundation were good; that the footings had been there for years, had compacted the soil and the flood would not have caused them to sink; that the concrete floor was old and patched, and around every column digging had been done for repairs at previous times; that it was evident that the inner walls of the building around the office and elsewhere were not in good shape prior to the flood because the cracks had the appearance of being old ones. It was further pointed out by expert witnesses for the defendant that between 1932 and 1939, an unusual drought occured in Kansas City, the effect of which was to absorb the moisture of the soil to a depth of approximately eighteen feet; that the result was that all buildings and foundations not extending deeper than the point affected by this drought were caused thereby to settle; that many buildings, both residential and industrial, in Kansas City, settled badly during that period, and contractors are still trying to remedy the effects of the same; that such settling caused the lowering of supports, cracking of walls, and damage to plastering, plumbing, and other parts of buildings.

The Director of Public Works of Kansas City testified for the defendant that he had spent about an hour examining the building in question a few months before the trial and examined the columns that support the second floor; that in his opinion the flood water, as described, in the short space of time it was in the building, could not have injured the pedestals beneath the column sufficiently to damage them. He described tests made of pressure on soil in footings for buildings where test holes have been exposed to rain water, showing no effect from the rains, and said it would be more difficult for water to

affect the footings where a concrete floor intervened; that in his opinion very little water would seep through the cracks and reach the bottom of the footings.

There was evidence that prior to the flood and in the years 1937, 1938, and 1939, various repairs had been made to the building, totaling $5875.90, among which was an item for shoring up wooden columns in December, 1937, $80; for April 1, 1939, $185; in May, 1939, $164.05 "for shoring and new pier on North side;" in September, 1940, "cost of raising three posts supporting building, $237.40;" between June, 1937 and December 31, 1940, there was expended $1209.10 for new joists and installation thereof.

Defendant's evidence further tended to show that plaintiffs' building had two connections with the sanitary sewer, but none with the storm sewers, nor is there any record of any permit obtained to make such latter connections.

The records of the United States Weather Bureau were introduced, showing that the total precipitation in Kansas City on June 27, 1941, was 2.60 inches; that within 45 minutes at one period of the day, 1.13 inches fell, and that a thunder storm was noted from 3:05 P. M. to 5:20 P. M., and from 5:49 P. M. to 8:11 P. M.; that on June 8th, there was a total precipitation in Kansas City of 1.21 inches, on June 9th, 2.51, and the greatest amount of rainfall in that month during any twenty-four hour period was 3.72 inches (8th and 9th); that on October 6, 1941, 3.01 inches fell; April 15, 1939, 4.66 inches, June 26th and 27th, 1929, 4.37 inches, July 8, 1926, 2.65 inches in one hour, 4.54 in two hours, and in 24 hours, 5.62 inches. The reports of the Weather Bureau further showed that on June 27th the river stage was 13.5 feet.

Defendant's first assignment of error is that the trial court erred in refusing its peremptory instructions offered at the close of plaintiffs' evidence and again at the close of all the evidence. Having proceeded to offer its own evidence on the merits of the case after refusal of the peremptory instruction offered at the close of plaintiffs' case, defendant is now in no position to complain of the refusal of its first peremptory instruction. [Porter v. Equitable Life Assur. Soc. of United States, 71 S. W. (2d) 766.]

The grounds assigned for error in the refusal of defendant's peremptory instruction offered at the close of all the evidence are: (1) that the evidence of the plaintiffs and of plaintiffs' witnesses shows that plaintiffs were guilty of contributory negligence as a matter of law; and (2) that such evidence shows that the alleged damages were not the natural and probable consequence of the negligence charged,—in other words, the negligence was not the proximate cause of the damages claimed.

Not having pleaded contributory negligence, defendant is not permitted to show affirmatively that there was contributory negligence.

However, if the testimony of plaintiffs' own witnesses shows that the plaintiffs were guilty of such contributory negligence as to preclude recovery, defendant can avail itself thereof. [Houts, Missouri Pleading and Practice, Section 102, page 167; Sissel v. St. L. & S. F. R. Co., 214 Mo. 515, 526, 527, 113 S. W. 1104; Tuttle v. Kline's, Inc., 230 Mo. App. 230, 241, 89 S. W. (2d) 676.] Defendant contends that contributory negligence was shown herein as a matter of law by the testimony of plaintiffs' own witnesses which, it is claimed, proved that (1) plaintiffs graded the parking lot adjoining its building so as to drain toward the loading door where the flood waters entered; (2) that plaintiffs knew four years before the flood that there was danger of water damage through the loading door because they agreed in the lease then made to enlarge said door and to make it "water tight;" (3) that after the flood, plaintiffs constructed a concrete barrier across the full width of the lower part of said door, thus admitting their negligence in not having constructed the same before June 27, 1941.

It has been ruled by the Supreme Court in this state in Cento v. Security Bldg. Co., 99 S. W. (2d) 1, 6:

"The question of plaintiff's contributory negligence was for the jury unless it can and should be said, as a matter of law, that no reasonably prudent person would have done as he did under the circumstances. That such is the law will be conceded. Also, in determining whether plaintiff was guilty of contributory negligence as a matter of law, the evidence in his favor must be accepted as true and the whole evidence viewed most favorably to him. [Rose v. Mo. Dist. Telegraph Co., 328 Mo. 1009, 43 S. W. (2d) 562, 81 A. L. R. 400.]"

Following the above rule, we must consider the plaintiffs' evidence in the light most favorable to the plaintiffs, and, unless it can be said that the conduct of the plaintiffs in the premises was such that no reasonable person would have done likewise, the plaintiffs cannot be held, as a matter of law, guilty of contributory negligence. We are of the opinion that the grading of the lot, the use of the building as shown, the repairs made or omitted, and the other conduct of the plaintiffs in the premises were not so unreasonable as to constitute contributory negligence as a matter of law, so as to preclude right of recovery herein. We so rule.

As stated, defendant based its second peremptory instruction also on the ground that the damages claimed were not the natural and probable consequence of the alleged negligence; that is to say, "the alleged wrongful act of the defendant was not the proximate cause of the damage." This precise issue was submitted to the jury in defendant's Instruction "O," and the jury, by its verdict, is deemed to have found that the damages to plaintiffs' building were not caused by overloading of the building, but were directly caused by the flood-

ing of said building due to the negligence of the city in having said flood gate closed and its pumps not operating at the time in question. But we are urged to hold that, as a matter of law, the proximate cause was not shown. There was evidence that for years prior to the flooding of the building on June 27, 1941, plaintiffs' building had been used for manufacturing purposes and had many times been loaded with machinery and merchandise to its capacity; that the building was placed in good condition of repair in 1937, when leased to the present tenant; that never before had surface water entered the basement of the building which, on the side of the grade, was provided with ditches and drains; that never since the construction in 1919-22 of the Turkey Creek Sewer, pumping station and flood gate had the said vicinity been subjected to floods; that prior to June 27, 1941, there had been rains in said city since the construction of plaintiffs' building in question, in excess of three and four inches; that on June 27, 1941, in the course of a rain of 2.60 inches, the basement of plaintiffs' building, located in the drainage area of defendant's Turkey Creek Sewer and Pumping Station, was flooded to a depth of 40 inches or more, the streets in the vicinity submerged to a depth of two or three feet, street cars in the same area were stalled on account of the water, stores and houses flooded, and storm sewers and manholes in the same sewer district were filled to capacity with standing water; that the next day the defendant's employees, in seeking the cause of the accumulation of flood waters, found the gate at defendant's Turkey Creek Sewer and Pumping Station nearby to be closed, the effect of which was shown to prevent surface water from the whole district from escaping through the main channel to the Kaw River; that when the gate was opened the remaining flood water which had accumulated, quickly escaped through the gate opening; that the pumps, designed to relieve the accumulation of storm waters when the gate was closed, had not been operated during said flood; that water was waist deep on nearby streets and running in currents therefrom over plaintiffs' premises; that manholes along the streets were filled to capacity with standing water. These facts and other facts in evidence make it impossible for us to declare, as a matter of law, that proximate cause was not shown.

We, therefore, hold that the trial court did not err in refusing defendant's peremptory instructions.

Defendant's next assignment of error is that plaintiffs' Instruction "1" is erroneous and prejudicial, in that it is ambiguous, argumentative, misleading, exceeds the scope of the petition and evidence, and implies that the city might have committed three actionable acts of negligence, two of them simultaneously. The instruction complained of is of great length. It required the jury to find and believe from the evidence, before it could find a verdict in favor of the plaintiffs, the ownership of the building to be in the plaintiffs; that at the

time and places in evidence defendant erected, owned, controlled, and maintained the storm sewers mentioned in the vicinity of plaintiffs' property; that defendant owned, controlled, and maintained, in connection therewith, the pumping station located near 28th Street and Southwest Boulevard in said city, connected with said storm sewers; that at said pumping station, as a part of said sewer system, defendant owned and controlled the pumps and flood gate mentioned in evidence; that said pumps and gate were used to control the flow of water through said storm sewers; that said gate, when lowered, closed said storm sewers, and prevented water from flowing through the same, and when raised, permitted such water to flow through the same; that the defendant, its agents and servants, had, prior to June 27, 1941, lowered and closed said flood gate, and at the time knew, or by the exercise of ordinary care and caution should have known, that in the event of heavy rains said storm sewers would fill with water unless said gate was raised and said pumps started and operated, and that said water would back up and flood the streets and buildings, including plaintiffs' building; that at said time and place a heavy rain fell and said storm sewers filled with water; that directly by reason of the fact that said gate was closed, if so, the water from said rain and in said sewer system backed up and flooded the streets and flowed into plaintiffs building; that defendant, its agents and employees negligently and carelessly failed and neglected to raise said flood gate, and negligently failed and neglected to start and operate said pumps, and that such failure was negligence on the part of defendant, and that as a direct result thereof said water in said sewers was caused to back up and flow into plaintiffs' building and thereby damage same, and that written notice was given to the city within ninety days after said damage, setting forth the time and place, character and circumstances of said damages, and plaintiffs' claim therefor.

Defendant argues that the instruction should have been predicated upon the showing of the true function of the flood gate which, defendant claimed, was primarily to prevent flood waters from the Kaw River backing up into the storm sewers and thereby flooding the vicinity. It argues that the purpose of the gate was not to prevent storm waters in the sewers from flowing through the outlet into the Kaw River.

Defendant admits in its brief that the stoppage of the flow of storm waters by the flood gate is incidental to its chief purpose and function. Clearly the effect of the closing of the gate, nevertheless is, as stated in the instruction, ''to prevent water continuing to flow through said sewer and, when raised, permitted water to flow through the same.'' We find no merit in this criticism of the instruction.

Defendant further argues that said instruction makes reference to the gate having been closed prior to June 27, 1941; that such time

is remote and immaterial on the issue of whether or not the gate was open or closed at the time of the flood in question, June 27, 1941. We believe this complaint unjustified. There was evidence that on the following day the gate was found to be closed. This, with evidence of the effect of the gate being closed upon storm water reaching the same, raised a reasonable inference, for the consideration of the jury, that such was the condition during the course of the storm and flood occurring during the morning and evening preceding. We think there was a fair inference from the evidence that the gate had not been raised or lowered on the day of the rain, June 27th, but that the act of closing it was prior to that day. In our opinion the jury was not misled by this reference to the time of closing of the flood gate.

Defendant further contends that Instruction (1) was erroneous in that the jury were told that they might find defendant guilty of two acts of negligence, to-wit: failing to raise or open the flood gate when the heavy rains fell on June 27, 1941, and negligently failing to start the pumps. It is claimed that such portion of the instruction exceeds the purview of the pleadings and the evidence. The petition charges that the damages complained of were caused by defendant's negligence in permitting the storm sewers controlled and operated by it in the vicinity of said building to become flooded so that the said sewers could not carry the heavy rains falling at that time; that the city controlled said storm sewers, together with the flood gate in connection therewith, and that the exact cause of said storm sewers backing up or flooding and causing the water to enter said building was unknown to the plaintiffs, but within the peculiar knowledge of the defendant, and that said damage would not have resulted but for the carelessness of the defendant in the control and operation of said storm sewer system in the vicinity of plaintiffs' property. We believe Instruction (1) did not exceed the purview of the petition in the respects assigned.

As to the evidence, there was substantial testimony that when the gate was closed for the purpose of preventing water backing up from the Kaw River into the storm sewers, the pumps, located at said station, provided a method and a means of pumping accumulated storm waters into the Kaw River through other channels if the closing of the gate caused an excess accumulation of such water from the storm sewers. Thus the failure of the city to open its flood gate may or may not have been negligence, depending on whether or not such closing made necessary the operation of the pumps, and if so, whether the pumps were so operated; and the failure of the city to operate such pumps may or may not have been negligence, depending upon whether or not the closing of the flood gate caused sufficient accumulation in the storm sewers to require this operation of the pumps. Thus, under the evidence, it was proper to submit to the jury the conduct of the city at the time and place in question, respecting both the

closing of the gate and the failure to operate its pumps. The instruction did not exceed the purview of the evidence in this respect.

Defendant's last assignment of error is that the verdict was excessive, the result of passion and prejudice and not supported by a preponderance of the credible testimony. The claimed items of expenditures for repairs made, and probable cost of repairs yet to be made, and the permanent damage to the building, claimed to have arisen out of the flooding of plaintiffs' building, were presented in great detail for the consideration of the jury. Defendant's evidence on those matters was fully and ably presented. From a careful study of the entire record, we are unable to conclude that the amount of the judgment is excessive or manifests passion or prejudice against the defendant.

We believe further that the amount of the damages was supported by substantial evidence. The credibility of the witnesses under the instructions and the law, was a matter for the jury's determination.

Having found no error in the trial of this cause, we conclude that the judgment therein should be affirmed. It is so ordered. All concur.