Carlyn **DONAHOO**, Respondent,

v.

**ILLINOIS TERMINAL RAILROAD COMPANY, a Corporation, Appellant.**

No. 45214.

Supreme Court of Missouri, Division No. 2.

March 11, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied April 8, 1957.

Ely, Ely & Voorhees, Robert C. Ely, St. Louis, for appellant.

Miller & Landau, St. Louis, for respondent.

JAMES W. BROADDUS, Special Judge.

This is an action for damages for personal injuries sustained by plaintiff, Carlyn Donahoo. This is the second appeal of the case to this court. On the former appeal, judgment for plaintiff for $55,000 was reversed, and the cause remanded. 275 S.W.2d 244. At the subsequent trial plaintiff had a verdict and judgment for $50,000. Defendant has again appealed.

We find no material difference in the facts developed in the two trials. They are fully stated in our former opinion. Thus for the purposes of this appeal it is only necessary to make a general statement of the facts which give a broad outline of the case.

The accident happened on November 13, 1951, in Madison County, Illinois, at a point where a highway known as Cotter's Hill Road crosses defendant's track some little distance east of the City of Wood River. Plaintiff resided in Staunton, Illinois, but was employed by the Shell Oil Company at its refinery in Wood River. In order to get to and from their work, thirty employees of the Shell Company residing in Staunton, including plaintiff, had purchased a Chevrolet carryall. This vehicle is similar to the ordinary station wagon. It was constructed so as to accommodate the driver and six passengers.

On the day in question plaintiff came off shift at 4:00 o'clock in the afternoon and immediately started for his home in the carryall along with six of his fellow employees. One Spagnola was driving and plaintiff was sitting in the second seat directly behind him. The other men occupied the remaining five positions in the car, one in the front seat to Spagnola's right; one in the short second seat to plaintiff's right; and three in the rear seat.

Leaving Wood River Spagnola drove on the old Edwardsville Highway which runs generally east and west as does Illinois Highway No. 159. His intention was to turn north on Cotter's Hill Road, an oiled secondary highway which ends at 159, and then turns east on 159. The old Edwardsville Highway runs almost parallel with and about one-fifth of a mile south of 159; and in between the two is defendant's single railroad track, which runs east and west about 100 feet south of 159. It is thus seen that after leaving the old Edwardsville Highway and turning north on Cotter's Hill Road it was necessary to cross defendant's track before reaching 159.

The evidence shows that the crossing was in bad condition. There were troughs or depressions from six to ten inches in depth on the outer sides of both rails.

The accident happened about twenty minutes after the group had left the plant. It was still daylight. The visibility was good and the roads were dry.

The carryall approached the crossing at a speed of about ten miles per hour. When its front bumper was about ten feet from the track Spagnola brought the vehicle to a complete stop. Spagnola then moved up to

a point five feet from the track and stopped again. At each of these stops both he and plaintiff looked in both directions but saw no train approaching. After the second stop Spagnola started over the crossing at a very low speed. He had progressed to a point where the front of the carryall was barely across the track when the carryall stalled, causing the motor to die, as the front wheels reached the depression just on the outside of the north rail. The moment the carryall stalled both plaintiff and Spagnola looked again to the east but saw no train. According to plaintiff, they could see down the track for a distance of 1,000 feet.

Spagnola started the motor and made another attempt to pull across the track, but again the motor died, causing the carryall to slip backward, as it had done before, until its front wheels came to rest in the "gully". For a second time Spagnola engaged the starter, and just as the motor started up, his companion on the front seat, one Zak, glanced to his right and called out "Oh, My God, here comes a train." At Zak's cry plaintiff looked to his right and saw the approaching train only 300 feet away. The carryall, after being put in motion, had moved forward about seven feet when it was hit by the train and pushed down the track for 1,221 feet. It had attained a speed of five miles per hour, and was picking up speed at the moment it was struck. Spagnola, Zak, and two others were killed. Plaintiff and the remaining two men managed to escape with their lives.

The train was composed of thirteen loaded coal cars and a caboose, and was being pulled by a Diesel engine. According to plaintiff and the other two survivors, the train when they first saw it, was running at a speed of twenty-five to thirty-five miles an hour, which was not decreased before the collision. They also testified they heard no bell or whistle until about the time the collision occurred.

■ Defendant's first point is that plaintiff was guilty of contributory negligence as a matter of law. The same contention was made on the first appeal. We went into the

question fully and held against that contention. The evidence at the second trial is not materially different from that introduced at the first trial. Our former opinion is the law of the case. Walsh v. Terminal R. Ass'n of St. Louis, 355 Mo. 377, 196 S.W.2d 192; Norris v. Bristow, 361 Mo. 691, 236 S.W.2d 316, 26 A.L.R.2d 366.

By Instruction No. 3 the jury was told that if defendant's acts or omissions submitted in Instruction No. 1 manifested a willful or reckless indifference to plaintiff's safety, then and in such event the contributory negligence of plaintiff was no defense to the case. The submission in Instruction No. 1 was that defendant's train crew saw or by the exercise of due care could have seen the carryall in a position of imminent peril in time thereafter by the exercise of ordinary care to have checked the speed of the train and thereby have avoided the collision.

■ It is the law of Illinois that contributory negligence of an injured party does not relieve a defendant from liability in an action for damages caused by the defendant's willful acts or omissions. Walldren Express & Van Co. v. Krug, 291 Ill. 472, 126 N.E. 97, 98; Heidenreich v. Bremner, 260 Ill. 439, 103 N.E. 275. Defendant concedes this to be true, but contends that "there is insufficient evidence in this case to prove that defendant was guilty of willful or wanton misconduct."

In the case of Brown v. Illinois Terminal Co., 319 Ill. 326, 150 N.E. 242, 244, 151 A.L.R. 1, it is stated: "A willful or wanton injury must have been intentional, or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of the impending danger, to exercise ordinary care to prevent it, or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care."

In the case of Cox v. Terminal R. Ass'n of St. Louis, 331 Mo. 910, 55 S.W.2d 685,

686, 687, this court said: "Under the law of Illinois the question of wantonness, willfulness, and recklessness is for the determination of the jury under all the facts and circumstances in evidence on that issue. All the decisions of that state so hold. The question arises in the Illinois cases on defendant's contention that there was no substantial evidence of wantonness, willfulness, and recklessness." (Citing many Illinois cases.)

In all of the many Illinois decisions there seems to be but one dealing with the law applicable to a situation where an automobile was stalled on a railroad crossing. That is the case of Janjanin v. Indiana Harbor Belt R. Co., 343 Ill.App. 491, 99 N.E.2d 578, 579. We quote from it as follows: "The *second count* alleged all the acts of negligence appearing in the first count but charged that they were committed in a willful and wanton manner.

\*   \*   \*   \*   \*   \*

"Defendant says that decedent could have seen, had she looked, approximately 1400 feet to the west. The evidence is not clear as to how far decedent's view to the west was unobstructed. Whatever that distance may have been it would seem that the members of the train crew riding in the cab of the locomotive could have seen decedent's stalled automobile an equal distance to the east. If the jury believed that defendant's freight train was traveling 20 to 25 miles an hour as it approached the intersection, we think the jury could find that the crew members in the exercise of ordinary care could have prevented the collision by stopping the train before it reached the intersection.

\*   \*   \*   \*   \*   \*

"A willful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure after knowledge of impending danger to exercise ordinary care to prevent it, or a failure to discover the danger through recklessness or carelessness, when it could have been discovered by the exercise of ordinary care. Schneiderman v. Interstate Transit Lines, 394 Ill. 569, 69 N.E.2d 293. Whether a personal injury has been inflicted by willful and wanton conduct presents a question of fact to be determined by the jury. Bernier v. Illinois Cent. R. Co., 296 Ill. 464, 129 N.E. 747. In our view the evidence in the case at bar fairly tends to support the allegations of the *second count* of the complaint."

In the case at bar, the jury had for consideration on the question of willful and reckless misconduct the fact that the carryall was stalled on the crossing when it first came into the line of vision of defendant's engineer or fireman when the Diesel was 1,000 feet east of the crossing. The train was then traveling at a speed of twenty-five miles per hour, according to defendant's engineer. At the instant the carryall was struck it was in motion, moving five miles per hour and progressively accelerating its speed, and had reached a position where the front wheels of the vehicle were out of the gully and seven or eight feet north of the north rail, and the rear wheels had passed beyond the south rail. The carryall would have been in the clear if it had been permitted to travel an additional eight to ten feet. Thus by checking the speed of the train only slightly the collision would have been averted. Under these facts, and particularly in view of the controlling authority of the Janjanin case, the trial court properly submitted the issue to the jury.

Defendant also says that if defendant was recklessly indifferent or guilty of wanton and willful misconduct, plaintiff was equally so and is therefore barred from recovery. Plaintiff's situation was not the same as that of defendant's crew. His position of peril was initially caused by defendant's violation of the Illinois law in failing to keep the crossing in a safe condition by allowing deep and dangerous gullies to form on both sides of each rail. Plaintiff was imperiled by the possible approach of trains from both east and west, whereas defendant's crew had only the forward direction with which to be concerned. Defendant's

crew had exclusive control of the operation of their train, whereas the automobile in which plaintiff was riding was being operated by another person. Plaintiff was in a position of sudden and dire emergency directly resulting from defendant's antecedent negligence and was not under obligation to exercise the same calm and deliberate judgment as would be expected of a person whose life and limb was not immediately imperiled. The contention lacks merit.

Defendant next contends that Instruction No. 1 given on behalf of plaintiff is erroneous because it fails to require a finding that the driver of the carryall and the other passengers in the carryall were in the exercise of due care. This contention is not available to defendant under the record in this case. The jury returned a general verdict in favor of the plaintiff and the presumption obtains that the jury found in favor of plaintiff on Instruction No. 3 and found that defendant was guilty of willful and reckless misconduct. Green v. Yeager, 336 Ill.App. 312, 83 N.E.2d 385; Barnhart v. Martin, 327 Ill.App. 551, 64 N.E.2d 743; Knittle v. Heyden, 337 Ill.App. 104, 85 N.E.2d 207; Farr v. Chicago & Eastern Illinois R. Co., 3 Ill.App.2d 209, 121 N.E.2d 5; State ex rel. Williams v. Daues, Mo. Sup., 292 S.W. 58, syl. 2; Hale v. Kansas City, 239 Mo.App. 12, 187 S.W.2d 31, syl. 6. Upon such finding, the asserted issue of contributory negligence passed out of the case. Little v. Blue Goose Motor Coach Co., 346 Ill. 266, 178 N.E. 496, syl. 7; Illinois Cent. R. Co. v. Leiner, 202 Ill. 624, 67 N.E. 398; Wabash R. Co. v. Speer, 156 Ill. 244, 40 N.E. 835.

■ Defendant also asserts that this instruction submits that plaintiff was oblivious to his peril, but "does not require the jury to find that defendant had notice that plaintiff was oblivious," and was therefore erroneous. Defendant cites no Illinois decision to support this contention. Each of the Missouri cases it relies on involved a situation where the plaintiff was *approaching* the pathway of defendant's vehicle. The constitutive facts in a case of this nature

under our law are stated in Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482. Obliviousness of a plaintiff to his peril is not one of them. He need neither allege nor submit it. Perkins v. Terminal R. Ass'n of St. Louis, 340 Mo. 868, 102 S.W.2d 915, 921, 922. The instant instruction required a finding that plaintiff was *"in a position of imminent peril"* and that "defendant's crew saw, or by the exercise of due care could have seen said carryall in said position of imminent peril * * *." This was sufficient. As said in the Perkins case, supra: "This instruction does require the jury to find that the plaintiff was in *'a position of imminent peril,'* and that was the ultimate or issuable fact for the jury to determine." (Emphasis supplied.) The fact that plaintiff assumed one unnecessary burden (that he was oblivious to his peril) is no reason why he should have assumed another.

■ Another complaint is that this instruction "nowhere" submits defendant's conduct as a proximate cause of the collision. The instruction hypothesizes the essential facts in accordance with the version of the collision as presented by plaintiff's witnesses. The rule is that where the jury is required to find facts from which a necessary inference follows that the negligence found was the cause of the injury, it is sufficient. Lackey v. United Rys. Co., 288 Mo. 120, 146, 231 S.W. 956. That is the situation here. The contention lacks merit.

■ In the damage instruction given on plaintiff's behalf it is submitted in part that the jury may compensate him "for such impairment of his ability to work and labor, if any, plaintiff is reasonably certain to suffer in the future. Defendant contends that there is no evidence from which it might be found, without speculation, that plaintiff will lose earnings in the future, and for that reason the instruction is erroneous. Defendant places particular stress upon the fact that plaintiff was able to return to work fourteen months after he was injured.

We will review the evidence as to the nature and extent of plaintiff's injuries when

we consider defendant's final point. In discussing the instant contention it is only necessary to say that those injuries were extensive and permanent and without doubt, were such as would normally impair plaintiff's ability to work in the future.

In Wolfe v. Kansas City, 334 Mo. 796, 68 S.W.2d 821, 822, we quoted with approval the following language appearing in the case of Estes v. Kansas City, C. C. & St. Jos. Ry. Co., Mo.App., 23 S.W.2d 193: "Capacity to labor * * * includes the capacity to earn money, and more. Our law is that recovery may be had for an impairment of the capacity to labor, although there may be in fact no actual loss of earnings * * *." We also quoted with approval this statement from Sutherland on Damages (4th Ed.) p. 4727: "Impaired ability to work is in itself an injury and deprivation, distinct from any loss of earnings it entails and the sufferer is entitled to compensation for it."

Also in the Wolfe case this court reaffirmed its holding in the case of Perrigo v. City of St. Louis, 185 Mo. 274, 84 S.W. 30, 34. The instruction in the Perrigo case permitted the jury to take into consideration "impairment of ability, if any, of the plaintiff to work or labor." It will be noted that almost this exact language appears in the instruction now before us. We quoted the following from the Perrigo case: "The jury were not authorized by the instruction in the case to allow damages for loss of time or services. They were simply told that, in determining the extent of her injuries, they might take into consideration any diminution of her power to work. To impair the power of any person, whether of body or mind, is an injury to personal right wholly apart from any pecuniary benefit that might be derived from the exercise of the power." The court did not err in giving the instruction.

Defendant's final contention is that the verdict is excessive. The evidence reflects that Mr. Donahoo was injured on the afternoon of November 13, 1951. Despite the skillful care which he received at Wood

River Hospital under Dr. Mendelsohn's direction, by the afternoon of November 15 he was at the point of death. Dr. Mendelsohn telephoned Dr. Flance in St. Louis, and through him arranged to have a team of surgeons ready to perform an emergency operation of a highly specialized nature on plaintiff immediately upon his arrival at Barnes Hospital. When Mr. Donahoo was delivered by ambulance at Barnes Hospital he had reached such extreme condition that he was cyanotic (i. e., his body had turned blue) and his breath sounds were "diminished to absent." The transverse processes of his first, second, third and fourth lumbar vertebrae were completely broken off. The tenth rib on his right side was fractured; all of the muscles which supported the right side of the abdomen were torn loose from their attachments to the transverse processes of the spine. His lungs were collapsed. The fibula bone of his right leg was broken. His abdomen had been subjected to such extreme crushing pressure that the contents of the abdomen burst the diaphragm which separated the abdominal cavity from the chest cavity, and a great portion of the contents of the abdomen was forced through the break into the chest cavity. The portions of the abdominal cavity thus extruded into the chest included the greater portion of the stomach, a portion of the omentum and the transverse colon, commonly known as the large bowel. The omentum "is an apron of fatty tissue which covers the abdominal organs."

He was immediately placed on the operating table and an incision fifteen inches long was made overlying the interspace of the seventh rib, extending from the middle of his spine and around to the center of his left side. A mechanical device was inserted into the incision and the ribs were spread apart to allow the surgeon more space for operating in the abdominal cavity. The hole torn in the diaphragm was cut to a greater size in order to facilitate pushing the stomach, colon and omentum back into his abdominal cavity. After the opening in the diaphragm had been repaired by suture, the left phrenic nerve was pinched with a

Kelly clamp in order to paralyze the diaphragm and thereby enable the ruptured portion of the diaphragm to heal.

Following the operation, and while he was still anesthetized a bronchoscopy was performed for the purpose of removing mucal pus from the right main bronchus and from the right lower lobe bronchus. One of his teeth was knocked out in the course of putting the bronchoscope down his throat. His kidney had been injured, causing blood to drain into the urine. There was a large hematoma of the left kidney which was palpable through the abdominal opening. A delayed reaction set in a few days after the operation and the patient became irrational and mentally disoriented. This was attributed to a brain injury sustained in the collision. Dr. Irwin Levy, the neuro-psychiatrist at Barnes Hospital, was then called into the case and associated with Dr. Cordonnier, the kidney specialist; Dr. Burford, the chest surgeon, and Dr. Flance. Eventually, Mr. Donahoo became rational and it was decided to transfer him back to Wood River Hospital for further treatment. Mr. Donahoo was knocked unconscious at the time of the collision and except for an occasional hazy recollection of Barnes Hospital did not become lucid until after he had been returned to Wood River Hospital.

Dr. Kilian Fritsch, orthopedic surgeon, testified that at the time of the trial plaintiff had a large bulge on his right side between his ribs and his hip. It was a herniation consisting of a large mass of intestines which were just covered with skin, and were not held in position by muscles in the normal manner. The condition resulted from the fact that the muscles which normally supported the right side of the abdomen had been torn loose from their attachments when the transverse processes were broken off of the spine. Plaintiff was required to wear an artificial support at all times to hold the right side of his abdomen in place. As stated by Dr. Fritsch, "he wears a garment like a woman, a two-way stretch girdle, and it bulges out like a football, it goes from the ribs all the way across to the ilium, in fact it overlaps the bone, and it goes down about two inches below it." Movement of the upper part of the body was narrowed and limited.

Dr. James F. McFadden, specialist in nervous and mental diseases, found a positive Romberg test, tremors of the eyelids, and other positive symptoms which reflected injury to his brain and spinal cord. Plaintiff had an instability in his right leg which he described with the phrase that "this leg wants to go out." The condition is permanent.

At the time of the trial, over three and one-half years after the casualty, plaintiff was still suffering from severe pain in the area of the surgical operation; "if I bump into anything it sets me crazy." He is subjected daily to intermittent headaches. He has difficulty in using his right leg, he loses control of it and starts limping, and "this leg wants to go out. Instead of carrying me forward, it wants to go in a circular way." All of these conditions are permanent. When examined by Dr. Fritsch on June 7, 1955, it was found that his condition was the same as when he had been examined in October, 1952. There had been no change in the size of the mass which bulged like a football out of the right side of his abdomen and hung down over the crest of his pelvis. The muscles and tissues in that area were found to have become permanently retracted. Muscles which normally controlled the movement of the right leg had been torn from their attachments, causing permanent disability.

Plaintiff's medical expenses amounted to approximately $1,700, and his loss in wages ran about $6,500. At the time of the trial he was 38 years old and had a life expectancy of 32.95 years. Plaintiff returned to his work on January 21, 1953. Upon his return to work, he received the same rate of pay (augmented by cost-of-living increases), but "the company has allowed me to take an easier job." He is incapacitated from performing the duties of his work as he did before the casualty. His fellow em-

ployees in his department have voluntarily assumed to perform for him the duties of his job which he is unable to perform for himself. Slight change of circumstances at his place of employment may at any time deprive him of his ability to support himself and his family.

As stated, this case has been twice tried. The first jury on December 19, 1952, returned a unanimous verdict for $55,000. That verdict had the trial court's approval. The second jury, on June 9, 1955, returned a unanimous verdict for $50,000. It too had the trial court's approval.

 As this court has stated many times, there is no precise formula for gauging whether a verdict is excessive. Each case must be considered upon its particular facts. Consideration is given the nature and extent of the injuries and losses, diminished earning capacity, changing economic factors and compensation awarded and approved in cases of similar or fairly comparable injuries. The nature, extent and permanency of the injuries are the paramount factors and the ultimate test of excessiveness or of inadequacy of award is what will fairly and reasonably compensate the plaintiff for his injuries. Brown v. Payne, Mo., 264 S.W.2d 341; Pitt v. Kansas City Public Service Co., Mo., 272 S.W.2d 193. And this court has also said many times that it must be kept in mind that the question of the amount of damages is primarily for the jury. Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 238 S.W.2d 674, 681.

We have permitted judgments for $50,000 to stand in three fairly recent cases. Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S.W.2d 568, 161 A.L.R. 383; Blew v. Atchison, T. & S. F. Ry. Co., Mo., 245 S.W.2d 31; Lange v. Kansas City Southern Ry. Co., Mo., 290 S.W.2d 71, 76. The injuries sustained in those cases were "fairly comparable" to those shown here. The record in the Blew case did not show total permanent disability.

We think the following language appearing in the Lange opinion, supra, clearly applies to the instant case: "Considering and giving effect to such priorly adjudicated cases, we conclude that we may not here *so precisely determine* the maximum amount for which a judgment in the instant case should stand as to hold that a judgment for $50,000, fixed by the trial court, is so far 'out of line' as to violate the uniformity rule."

The case was well tried. The judgment should be, and is, affirmed.

EAGER, P. J., and STORCKMAN, J., concur.

LEEDY, J., not sitting.